356 So.2d 1151 (1978)
Kenneth McDANIEL
v.
STATE of Mississippi.
No. 50037.
Supreme Court of Mississippi.
March 15, 1978.
Rehearing Denied April 12, 1978.
*1152 Ronald N. Ashley, C.A. Henley, Jr., Jackson, for appellant.
A.F. Summer, Atty. Gen., by Karen Gilfoy, Asst. Atty. Gen. and Frankie Walton White, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
WALKER, Justice, for the court:
McDaniel was convicted of armed robbery in the Circuit Court of the First Judicial District of Hinds County, Mississippi. The jury found him guilty, but recommended leniency. The court sentenced McDaniel to fifteen years in the State penitentiary.
The record reveals that on September 20, 1975, at about 7:30 p.m., Reverend Joseph H. Booth and his wife went to Cook's Lake, on the outskirts of Jackson, for a cookout. Booth testified that shortly after their arrival at the lake a white man with an eight-year-old boy drove up in a pickup truck. He told Booth and his wife:
I want to warn you all that there are some Negroes that are coming down to this lake and robbing people. Several nights ago, they robbed me. I'm down here with some guns in my pickup and I intend to shoot them.
(A police offense report indicated that defendant had been robbed by three black males approximately six weeks before the present occurrence. This robbery occurred in the City of Jackson at Woodrow Wilson Avenue and Whitfield Mill Road, as defendant sat in his car at a red light).
Subsequently, the Booths and McDaniel engaged in conversation, with McDaniel rebuilding the Booths' fire after they had difficulty getting it going. At some point, Rev. Booth attempted to witness to McDaniel. McDaniel then became agitated and annoyed with Booth. When the defendant walked a short distance away, Mrs. Booth suggested to her husband that they go home. She walked to their car, and while Booth was emptying the hot coals out of the grill, defendant suddenly ran up behind him, put both arms around him, stabbing him with a knife in his left hand. He then told Booth that he knew Booth had a pistol in his pocket and told him to drop it. Throughout this, he was threatening to kill Booth. Booth dropped the .22 calibre pistol and defendant's stepson picked it up and gave it to defendant. Defendant then cocked the gun, and still holding a knife to Booth's throat, told the boy to get Booth's pocketbook.
The defendant then kept Booth there for approximately thirty minutes. A police car approached with its lights on, (Mrs. Booth had run away at the beginning and had procured the aid of the police) and when McDaniel saw the approaching police car, *1153 he turned Booth loose and fled. The investigating officers, upon arrival, found defendant's stepson still in defendant's truck, with the keys in his pocket. The truck was registered in defendant's name, but he was not found. The defendant was apprehended in Kentucky or Tennessee some thirty days later.

I.
At trial, the defense theory was that defendant was so intoxicated he could not form the requisite intent required for the commission of armed robbery.
At the outset, the proper standard concerning voluntary intoxication as a defense must be kept in mind. In Kelly v. State, 11 (3 S&M) Miss. 518 (1844), the standard was enunciated as:
... it must be clearly proved, that, at the time of committing the act, the party accused was laboring under such a defect of reasons, from disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did understand them, that he did not know he was doing what was wrong. (Emphasis added). (11 Miss. at 528).
In Thurmond v. State, 212 Miss. 36, 53 So.2d 44 (1951), (a murder case) where the Court had under consideration the extent, if any, of voluntary intoxication which would reduce a crime from murder to manslaughter, an instruction was allowed which enunciated the standard as:
... it must be intoxication of such a degree as to render the slayer incapable of comprehending his relation to others, incapable of formulating an intent to kill, and unconscious of the nature and probable consequences of his act.[1] (Emphasis added). (212 Miss. at 44, 53 So.2d at 46).
The Court then went on to point out that on the facts of the case they were not presented with intoxication which was "totally disabling." Thurman v. State, supra; See also Kendall v. State, 244 Miss. 618, 145 So.2d 924 (1962).
Other authorities have been more specific requiring intoxication "... of that degree and extent as renders accused practically an automaton... ." Tate v. Commonwealth, 258 Ky. 685, 80 S.W.2d 817, 821 (1935) or that it is "[S]o extreme as to entirely suspend the power of reason." People v. Lion, 10 Ill.2d 208, 139 N.E.2d 757, 760 (1957) or "impossible ... to form a criminal intent." Gower v. State, 298 P.2d 461, 464 (Okl.Cr. 1956).
It is clearly established in Mississippi that the credibility of witnesses is particularly within the province of the jury and not for the Supreme Court to determine on appeal. Murphree v. State, 228 So.2d 599 (Miss. 1969). It is also well established that in reviewing the sufficiency of evidence to support a verdict, this Court must accept as having been established all that was proved by the evidence as well as all that such evidence reasonably tended to prove, together with all reasonable inferences to be drawn therefrom, favorable to the theory of prosecution. Carroll v. State, 196 So.2d 878 (Miss. 1967). More specifically, this Court has pointed out on numerous occasions that where the defense theory is voluntary intoxication to such an extent as to render the defendant incapable of forming the necessary intent, "... the issue [is] a factual one and its resolution [is] peculiarly for the jury." Berry v. State, 288 So.2d 457, 459 (Miss. 1974) (with other cases collected therein).
When these standards are applied to the present case, the following is revealed by or may be inferred from the record:
The defendant was identified as being the perpetrator of the crime through the cumulative testimony of the victim, the victim's wife, and the officers who found the defendant's truck and stepson at the scene of the crime. The defendant does not deny the crime but only contends that he cannot remember because of alcohol induced amnesia.
The uncontradicted testimony accepted by the jury reveals that the defendant held a knife on the victim, actually cutting him, took his billfold, and upon the approach of a police car fled the scene. The act of fleeing in itself reflects a knowledge of wrongful actions. Additionally, his own wife testified *1154 that when he returned home at 11 p.m. (during the period he allegedly does not remember and was incapacitated to such an extent he could not tell right from wrong), he stated to her: "Well, even if they just want to talk to me, its still going to break parole... . I just, I just can't do that."
Again, this indicates a conscious awareness of right and wrong and the ability to make a judgment. Other testimony tended to impeach the defendant's alleged loss of memory, e.g., the jury must certainly have noted the telling fact that the defendant had no difficulty remembering exactly how much he had drunk (a fact necessary to his defense), but allegedly could remember nothing else.
It is argued by defendant that it is significant that he stated he thought the victim was the person who had robbed him previously, but the uncontradicted evidence tends to minimize the impact of any such statement. Without contradiction or even offer of contradiction by defendant's witnesses, the record reveals that just minutes before such alleged statement was made, the defendant had been telling the victim that those who had robbed him were blacks and had warned his victims to be cautious. This illustrates a conscious knowledge of who had robbed him and belies the contention that a statement accusing his victim of robbing him shows that he could not tell right from wrong. Further, this is not a case of an individual reduced by alcohol to total helplessness, but rather one where the individual was capable of conversing, building a fire, taking a gun from his victim, and driving an automobile, all when allegedly unable to form "intent."
We are of the opinion that when the evidence is construed in the light most favorable to the verdict as found by the jury, as is the proper standard, there can be no doubt as to the correctness of the jury in disregarding appellant's plea of intoxication as a defense.

II.
The case of Aetna Life Insurance Company v. Evins, 199 So.2d 238 (Miss. 1967) relied on by appellant in support of his contention that the court and jury were bound to accept the opinion of his medical experts that he was unable to form the necessary intent to commit a crime is patently inapplicable in the case sub judice. The thrust of this decision is that medical testimony may be conclusive where the subject matter under consideration is such that (1) a jury could have "no knowledge whatsoever except as conveyed by medical experts", and (2) the medical testimony on the matter is undisputed. The effect of intoxication on persons, including its bearing on their ability to form an intent to do a specific act does not lie within the exclusive province of medical experts, nor is it "wholly beyond the range of the experience or observation of layman ... [including judges and jurors]." Kramer Service v. Wilkins, 184 Miss. 483, 488, 186 So. 625, 628 (1939). In addition, the medical testimony was not undisputed. It was self-contradictory or, at best, susceptible of two interpretations.

III.
Was the state's failure to disclose certain investigative reports reversible error?
Eight days before trial, defendant filed a motion to compel production and disclosure. The motion was granted and among other things required the state to disclose information in the possession of the state which "may be favorable to the defendant and material to the issue of guilt or punishment and which in any manner may aid defendant in the ascertainment of the truth."
The defendant alleges that the failure of the state to disclose two investigative reports containing alleged reports of exculpatory statements made by the defendant to the victim to the effect that appellant, at the time of the crime charged, was drunk and acting under the delusional belief that the victim was the person who had robbed him, constitutes reversible error under the holdings of the United States Supreme Court cases of Brady v. Maryland, 373 U.S. *1155 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).
In Brady, that Court ruled that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment... ." (373 U.S. at 87, 83 S.Ct. at 1196).
However, both Brady and Agurs involved situations where the prosecutor withheld or suppressed evidence which did not come to light until after trial and conviction of defendant. Here, to the contrary, the information involved was inspected by the trial court on no less than three occasions before or during trial, and the defendant through his own witnesses possessed knowledge of the existence of the reports and their content, most probably long before trial but definitely by time of trial.
Defendant's own witness, Dr. Guild, testified that on the night of the incident he was functioning as a deputy sheriff of Hinds County and that he was present at the interview from which the investigative reports in question were made. At trial, defendant's attorney on direct examination asked:
Was there a variance in the doctor's  in the Reverend's testimony today as to what it was when you originally talked with him on September 20th?
Dr. Guild then answered:
There was a variance.
Subsequently, on cross-examination of Dr. Guild, when asked why he thought the defendant had a delusional belief, he said:
A. The first indication would be statements that indicated at the time that he was suffering from a delusional belief when those individuals had significantly no reason to falsify it.
Q. They didn't. Who were these people?
A. These people would be the victim and his wife.
.....
Q. The victim and his wife told you things that led you to believe that he was having a delusion?
A. That is correct.
Clearly the alleged variance in testimony was put before the jury to consider for whatever weight or impeachment value it might have.
Again, on cross, Dr. Guild stated:
A. I think what really did it was the statement that all of this bizarre behavior, that he was acting strange, peculiar, unusual, whatever you want to call it, strange, peculiar, unusual, I think the key statement, if you have to get down to the absolute key statement, the statement was that statement made by the victim that he said that Mr. McDaniels told his son to get his wallet, to get my wallet. He told his son to get my wallet. I think that is  if you've got to hang your hat on one thing, and it's not on one thing, but that's probably the most convincing thing of all. (Emphasis added).
Q. Okay. And just being drunk and saying that wouldn't be enough, would it?
A. No.
Furthermore, the defendant's attempts to impeach the victim and his wife on cross-examination reveal that the information was in his possession at the time of trial:
Q. Reverend Booth, have you made a statement to the authorities at the time this incident occurred, a previous statement?
A. Ask the question again, sir.
Q. Have you already related this story to the authorities  did you, at the time the incident occurred, relate your story, just as you told it to me today, to the authorities then?
A. I told them some of the same identical things that I have told you. Those little things they asked, that's what existed and that's what I told them.
Q. And you have already told them that today?
A. Today?
Q. You had already given them a statement, had you not?
A. Oh, yeah, we talked, certainly we talked.

*1156 Q. Who did you give that to?
A. To the deputies.
Q. Of the Hinds County Sheriff's Department?
A. That's correct.
Examination of the victim's wife revealed:
Q. I see. Okay. Have you given any previous statements as to what happened that night to the police or the Hinds County Sheriff's Department?
A. Yes, sir, to the Hinds County Sheriff's Department.
Q. You did?
A. Yes, sir.
Q. Were your statements then substantially the same as they are now?
A. Yes, sir.
Q. Did you tell them then, at that time, that the man that attempted to rob your husband was drinking quite heavily and that  let me finish it  and that he kept saying, "I want my billfold back. You have my wallet." Did you tell them 
A. I wasn't there when anything went on about the wallet.
Q. I see. Did you tell them anything in regard to him drinking quite heavily at that point?
A. I told them that I thought he was drinking, because he sent the little boy and got this bottle in the bag.
Q. I see. I see. But it's your testimony today that you don't feel like he was drunk, is that right?
A. Yes, sir.
.....
Q. Let me ask you this question.
A. Yes, sir.
Q. Did you make the statement that the man that was there that night appeared to be drunk?
A. I said he appeared to be drinking. I'm sure. I don't think that I used the word drunk. I shouldn't have if I did.
The combined effect of this testimony is to demonstrate that the defendant had knowledge of the existence and content of the statements in the investigative reports prior to the trial. Additionally, here, the existence of this alleged variance in statements was placed before the jury for its consideration by the above quoted testimony. Therefore, we hold that where, as here, the defendant had knowledge, before trial, of the existence and content of the material in the possession of the prosecutor, it may not thereafter be claimed that such material was suppressed. In such cases, there is no violation of the principles announced in Brady and Agurs.
The judgment of the lower court is affirmed.
AFFIRMED.
SUGG, BROOM and LEE, JJ., concurring.
SUGG, WALKER, BROOM and LEE, JJ., specially concurring.
ROBERTSON, P.J., PATTERSON, C.J., and SMITH, P.J., dissenting.
BOWLING and COFER, JJ., took no part.
SUGG, Justice, specially concurring:
I agree that the reasons stated in Justice Walker's majority opinion are sufficient to require affirmance of this case; however, I suggest another reason for affirmance, namely, voluntary intoxication by a defendant should not be permitted as a defense if a defendant, when sober, is capable of distinguishing between right and wrong, and the defendant voluntarily deprives himself of reason by intoxication, and commits an offense while in that condition.
At the outset, it should be noted that our decisions dealing with the question of whether voluntary intoxication of a defendant should be submitted to the jury as a defense in specific intent cases are conflicting. As stated in Kendall v. State, 244 Miss. 618, 145 So.2d 924 (1962):
The many cases on voluntary intoxication in this and other states are candidly impossible to reconcile. (244 Miss. at 623, 145 So.2d at 926).
For ready reference our cases involving voluntary intoxication as a defense are listed *1157 in the appendix in two classifications with the cases appearing in chronological order in each classification.
The first case where voluntary intoxication was considered was Kelly & Little v. State, 11 Miss. (3 S&M) 518 (1844). The defendants argued that, from the fact of their intoxication, the jury could infer the want or absence of a premeditated design to commit murder. The state was granted an instruction that drunkenness is no excuse for crime. Defendants were refused an instruction that the jury was entitled to regard "a state of serious intoxication" as an element in determining whether a premeditated design existed. The Court stated that "no injury occurred to the prisoners" because they were convicted of manslaughter. The Court noted that the instruction requested by the defendants had reference only to a single instance of intoxication and had no reference to well defined and unmistakable insanity produced by a long continued or excessive use of intoxicating stimulants. The Court then stated the common law rule as follows:
Legal writers, from the earliest times to the present, agree that mere drunkenness is no extenuation or excuse for crime in the view of the law. `He who is guilty of any crime whatever, through drunkenness, shall be punished for it as much as if he had been sober.' 1 Hawk. P.C. 3. `A drunkard,' says Lord Coke, `is voluntarius doemon, and hath no privilege thereby.' Judge Story, commenting on the same subject, says: `If persons willfully deprive themselves of reason, they ought not to be excused one crime by the voluntary perpetration of another.' (11 Miss. (3 S&M) at 527).
In disposing of the argument of the defendants that intoxication could be considered as a circumstance from which a jury could infer the want or absence of a premeditated design to commit a felonious act, the Court stated:
The fact of the party being intoxicated, has, indeed, been holden to be a circumstance proper to be taken into consideration, where the sole question is, whether an act was premeditated, or done only with sudden heat and impulse. The same may as truly be said of the passion of anger, or any other excitement arising from sudden provocation or peculiar circumstances. But how slight that consideration should be in the instance of intoxication, is readily conceived from the as equally just presumption, that the design to commit a crime may have previously existed or been contemplated, and the intoxication have been employed `to screw the courage to the sticking place.' Hence it is, that the law discriminates between the delusion of intoxication and the insanity which it may ultimately produce. For if the mere fit of drunkenness is always to be held as an excuse for crime, there is at once established a complete emancipation from criminal justice. (11 Miss. (3 S&M) at 527, 528). (Emphasis Supplied).
The holding in Kelly & Little permits insanity as a defense even if it results from prolonged use of intoxicants, however, it does not permit voluntary intoxication as a defense. The test under Kelly & Little is whether a defendant, when sober, is capable of distinguishing between right and wrong.
This was the construction placed on Kelly & Little, supra, by this Court in Melton v. State, 155 Miss. 659, 124 So. 802 (1929). In this case Melton's defense was that he was in such a state of complete intoxication at the time of the homicide he was utterly destitute of reason and wholly incapable of forming a premeditated design to commit murder. In an opinion by Justice Griffith, the Court cited Kelly & Little, supra, as authority for the rule that, in a prosecution for homicide, voluntary intoxication is no defense because a person is responsible for his acts committed while in a state of voluntary intoxication. The Court stated:
The record shows that, while the deceased was attempting to do a friendly act towards appellant, and without any reason on the part of anybody there present to suspect danger, appellant suddenly announced with an oath that he was going to kill deceased, and immediately *1158 shot him. Upon such a record we would be at a loss how or where to draw a line between partial intoxication, and the so-called complete intoxication. The dangerous ground that would be entered upon in the attempt to draw such a line admonishes us against the venture, and compels us to remain within the established doctrine that voluntary intoxication is no defense.

`Such a principle is absolutely essential to the protection of life and property. In the forum of conscience there is no doubt considerable difference between a murder deliberately planned and executed by a person of unclouded intellect, and the reckless taking of life by one infuriated by intoxication; but human laws are based upon considerations of policy, and look rather to the maintenance of personal security and social order, than to an accurate discrimination as to the moral qualities of individual conduct. But there is, in truth, no injustice in holding a person responsible for his acts committed in a state of voluntary intoxication. It is a duty which every one owes to his fellow-men and to society, to say nothing of more solemn obligations, to preserve, as far as it lies in his own power, the inestimable gift of reason. If it is perverted or destroyed by fixed disease, though brought on by his own vices, the law holds him not accountable. But if by a voluntary act he temporarily casts off the restraints of reason and conscience, no wrong is done him if he is considered answerable for any injury which in that state he may do to others or to society.' People v. Rogers, 18 N.Y. 9, 18, 72 Am. Dec. 484, 488, 489. (155 Miss. at 661, 662, 124 So. at 802, 803). (Emphasis Supplied).
Melton was quoted with approval in Thurmond v. State, 212 Miss. 36, 53 So.2d 44 (1951) and Stokes v. State, 240 Miss. 453, 128 So.2d 341 (1961). In Stokes, the Court stated:
The appellant complains of the refusal of the instructions on intoxication. Voluntary intoxication is no defense in a murder case. (240 Miss. at 472, 128 So.2d at 348.
The first case which indicated that voluntary intoxication may negate specific intent was Long v. State, 163 Miss. 535, 141 So. 591 (1932) where the Court stated:
It is no defense to a crime, so far as the manslaughter feature is concerned, that the party was so drunk, if he was in fact so drunk, as to not know the nature of the crime he was committing. His being drunk was his voluntary act. He deliberately and purposely drank the liquor, and prepared and consented for the party at which the liquor and women were to be used. In no circumstances could he be justified in placing himself in such intoxicated condition that he would not know the nature of his act, and then set up his voluntary act in bringing about this condition as a justification or excuse of what he did.

This court has frequently decided that voluntary intoxication is no defense to a crime, unless a specific intent is necessary to constitute crime, and that a person cannot take advantage of a situation he has placed himself voluntarily in. Melton v. State, 155 Miss. 659, 124 So. 802; Butler v. State (Miss.) 39 So. 1005; Gordon v. State (Miss.) 29 So. 529; Kelly v. State, 3 Smedes & M. 518, and decisions of other states to the same effect. (163 Miss. at 547, 141 So. at 593) (Emphasis Supplied).
The cases cited in Long simply do not support the statement in the opinion that voluntary intoxication is no defense to a crime, unless a specific intent is necessary to constitute the crime.
The first case decided by this Court involving the defense of voluntary drunkenness in a case other than a homicide case was Edwards v. State, 178 Miss. 696, 174 So. 57 (1937), which involved the larceny of an automobile by a sixteen-year-old youth. The Court held that the offense of larceny required proof of specific intent and, if the youth was so intoxicated he did not know what he had done, and had no intention of keeping the automobile, and if the jury so found then he was not guilty of larceny. *1159 The Court held that an instruction for the state which told the jury that voluntary drunkenness was no defense was error in a prosecution for grand larceny because specific intent is a necessary element of grand larceny. In Edwards the following statement was made:
Drunkenness is at least quasi criminal, and if a person while voluntarily drunk commits a criminal act, the drunkenness supplies the criminal intent, except where a specific intent is necessary to constitute the crime charged. (178 Miss. at 698, 174 So. at 58).
The rule was stated in this case that, if a person, while voluntarily drunk, commits a crime, the general criminal intent will be supplied by the drunkenness, but specific intent will not be supplied by the drunkenness. It is difficult to justify the exception made in Edwards, supra, with respect to "specific intent" crimes because it is just as logical to supply "specific" as "general" intent from the acts of the accused. There is no valid reason to supply general criminal intent in offenses committed by a person who is voluntarily intoxicated and refusing to supply specific intent in offenses committed by a defendant who is voluntarily intoxicated where specific intent is an element of the offense. This is in accord with the holding in other states.[1] For example, in State v. Jordan, 285 Mo. 62, 225 S.W. 905 (1920) the Missouri Supreme Court stated:
[T]he general and, we may say, the almost universal rule, to which we have always adhered in this state, is that the defense of voluntary drunkenness cannot be interposed to an offense committed as the immediate result of such drunkenness, and, although there may be no criminal intent, the law will by construction supply same; this under the well-recognized principle that one who voluntarily assumes an attitude likely to produce harm to others, despite any specific intention to injure, is responsible for the consequences of his act. Coke, Litt. 247a. (225 S.W. at 906, 907).
The Missouri rule is sound because, if a person by a voluntary act temporarily casts off the restraints of reason and consciousness, no wrong is done him if he his held accountable for any injury which he may do to others or to society while in that state.
It should be remembered that, when Edwards, supra, was decided, the only statutory authority for suspension of sentences was section 99-19-25 Mississippi Code Annotated (1972) (then Section 1298 Mississippi Code of 1930) which authorized the circuit and county courts to suspend sentences in misdemeanor cases only. The "probation and Parole Law" was amended by Chapter 262 Mississippi General Laws 1956, and in sections 10 and 11 the statutory authority of circuit and county courts to suspend sentences was extended to include felonies. Before 1956 the circuit and county courts had no statutory authority to suspend sentences in felony cases. In Edwards the Court was faced with a sixteen-year-old youth who stole an automobile while drunk. To avoid the harshness of the common law rule that voluntary intoxication is not a defense, the Court adopted the rule in Edwards. In my opinion the reason for the rule no longer exists because under the Probation and Parole Act the trial judge, when sentencing a defendant who is voluntarily intoxicated, may consider this fact as a mitigating circumstance in determining whether to suspend the imposition or execution of a sentence. This alternative was not available to the Court when Edwards was decided, so at least part of the reason for the exculpatory rule no longer exists.
For a time following Edwards, the Court expressed uncertainty about the rule announced therein because in Wixon v. State, 229 Miss. 430, 90 So.2d 859 (1956) the Court approved an instruction which stated that voluntary drunkenness is no excuse or justification *1160 for the commission of a crime because one cannot take advantage of a situation in which he has placed himself voluntarily by being drunk or drinking. In approving the instruction the Court relied on Thurmond v. State, 212 Miss. 36, 53 So.2d 44 (1951). Wixon argued that he should have been granted an instruction permitting the jury to acquit him if it found from the evidence that he was intoxicated at the time of the offense, and such intoxication incapacitated him from forming a deliberate design to kill the victim. The Court held that it was not error to refuse the instruction, and stated:
Without our so deciding, it may be that in a case where the evidence justifies it this instruction should have been given, but the appellant's own testimony shows that he was not entitled to it in the case at bar. (229 Miss. at 436, 90 So.2d at 862).
Following this statement the Court then delineated evidence which showed that Wixon was able to describe the events at the time of the shooting and concluded that, even though he was drunk, he was not entitled to the instruction. The statement that, "It may be that in a case where the evidence justifies it this instruction should have been given," indicates some uncertainty about the holding in Edwards, especially in view of the later statement in Stokes v. State, supra, (1961) that voluntary drunkenness is not a defense.
However, Edwards was followed in a number of cases authorizing submission to the jury the question of whether a defendant was intoxicated to the extent that he was not capable of forming the specific criminal intent to commit an offense where specific intent is a necessary element of the offense. These cases are listed in the second classification in the appendix and have culminated in the principle that voluntary intoxication is not ordinarily a defense except where such intoxication rises to the level of the standard defense of insanity, namely, inability to know right from wrong. This rule was stated in Berry v. State, 288 So.2d 457 (Miss. 1974) as follows:
Mere voluntary intoxication is not ordinarily a defense and is a defense when, and only when, such intoxication exists to a degree or extent which renders an accused incapable of forming the necessary intent to commit the crime charged and incapable of knowing right from wrong. Upon the evidence in this case the issue was a factual one and its resolution was peculiarly for the jury. Ladner v. State, 231 Miss. 445, 95 So.2d 468 (1957); McFarland v. State, 212 Miss. 802, 55 So.2d 457 (1951); McPherson v. State, 208 Miss. 784, 45 So.2d 589 (1950); Edwards v. State, 178 Miss. 696, 174 So. 57 (1937). (288 So.2d at 459)
Further discussion of specific cases from this Court are not necessary because it is apparent that our treatment of voluntary intoxication as a defense creates an anomalous situation. A drunk may be totally absolved of committing a serious offense where specific intent is an element of the offense, but be convicted of other equally serious offenses which do not require a showing of specific intent. Further, a review of manslaughter cases under our culpable negligence statute reveals that simple negligence in automobile cases is sometimes raised to culpable negligence because of the intoxication of the offender.
The exculpatory doctrine permitting voluntary intoxication as a defense in specific intent crimes has developed since our decision in Edwards, supra. We should reexamine this doctrine because the premise on which Edwards was decided is not sound as heretofore discussed. Until Edwards was decided in 1937, and in later cases, we have followed the rule that if a person committed a crime while voluntarily intoxicated to the extent that he was unable to distinguish between right and wrong, such intoxication did not operate as complete emancipation from criminal justice.
For many years we followed the common law rule as an absolute by reasoning that there is no injustice in holding a person responsible for crimes when committed in a state of voluntary intoxication. This is a sound rule because if a person casts off the restraints of reason and consciousness by a *1161 voluntary act, no wrong is done to him if he is held accountable for any crime which he may commit in that condition. Society is entitled to this protection.
A majority of the justices participating in this decision having concurred in the views expressed herein, we hereby adopt the following rule: If a defendant, when sober, is capable of distinguishing between right and wrong, and the defendant voluntarily deprives himself of the ability to distinguish between right and wrong by reason of becoming intoxicated and commits an offense while in that condition, he is criminally responsible for such acts.
This is a proper case in which to adopt the foregoing rule because McDaniel's sole defense was that he was so intoxicated that he was not able to distinguish between right and wrong; therefore, all cases listed in the appendix authorizing submission to a jury the question of voluntary intoxication as a defense in specific intent offenses are hereby overruled insofar as they conflict with the rule announced herein.
Adoption of the above rule does not prohibit a trial judge, when sentencing a defendant, from considering voluntary intoxication as a mitigating circumstance in the light of all the surrounding circumstances.
WALKER, BROOM and LEE, JJ., join in this specially concurring opinion.

APPENDIX

 HOMICIDE CASES:
 1844 - Kelly & Little v. State, 11 Miss. (3 S&M) 518
 (Convicted of Manslaughter)
 1901 - Gordon v. State, 29 So. 529
 (Convicted of Murder)
 1906 - Butler v. State, 39 So. 1005
 (Convicted of Murder)
 1929 - Melton v. State, 155 Miss. 659, 124 So. 802
 (Convicted of Manslaughter)
 1932 - Long v. State, 163 Miss. 535, 141 So. 591
 (Convicted of Manslaughter)
 1933 - Cole v. State, 170 Miss. 800, 150 So. 757
 (Convicted of Murder)
 1941 - Hand v. State, 190 Miss. 314, 200 So. 258
 (Convicted of Manslaughter)
 1949 - Gaddis v. State, 207 Miss. 508, 42 So.2d 724
 (Convicted of Murder)
 1951 - Thurmond v. State, 212 Miss. 36, 53 So.2d 44
 (Convicted of Murder)
 1961 - Stokes v. State, 240 Miss. 453, 128 So.2d 341
 (Convicted of Murder)
 1973 - Bieller v. State, 275 So.2d 97
 (Convicted of Manslaughter)
 CASES INVOLVING OTHER OFFENSES:
 1937 - Edwards v. State, 178 Miss. 696, 174 So. 57
 (Grand Larceny)
 1943 - Bullock v. State, 195 Miss. 340, 15 So.2d 285
 (Burglary)
 1949 - Edwards v. State, 207 Miss. 328, 42 So.2d 230
 (Grand Larceny)
 1950 - McPherson v. State, 208 Miss. 784, 45 So.2d 589
 (Robbery)
 1951 - McFarland v. State, 212 Miss. 802, 55 So.2d 457
 (Burglary)
*1162 CASES INVOLVING OTHER OFFENSES:
 1956 - Wixon v. State, 229 Miss. 430, 90 So.2d 859
 (Assault and Battery With Intent to Kill and Murder)
 1957 - Ladner v. State, 231 Miss. 445, 95 So.2d 468
 (Burglary)
 1959 - Best v. State, 235 Miss. 318, 108 So.2d 840
 (Grand Larceny)
 1962 - Kendall v. State, 244 Miss. 618, 145 So.2d 924
 (Indecent Assault on Female Child)
 1968 - King v. State, 210 So.2d 887
 (Grand Larceny)
 1974 - Berry v. State, 288 So.2d 457
 (Attempted Armed Robbery)
 1974 - Ryals v. State, 305 So.2d 354
 (Assault and Battery With Intent to Kill and Murder)

ROBERTSON, Presiding Justice, dissenting:
I respectfully dissent.
McDaniel testified that he started drinking early on the morning of September 20th and continued to drink throughout the day, drinking over an eight-hour-period a case of beer and three fifths of brandy. He remembered nothing after driving to his garden with his wife, and in the early afternoon sowing some turnip seed. However, he did remember waking up late that night in the garden and walking home.
Linda McDaniel, defendant's wife, testified that he had had three six-packs of beer and a fifth of brandy, and had started on another fifth of brandy by noon of the 20th; that they had worked in the garden that morning and had returned home and, while she was preparing supper and he was in the backyard with the little boy, she heard him drive off in his truck. She stated that he was pretty drunk at that time. He returned home about 11:00 p.m. Mrs. McDaniel further testified:
"Well, I was trying to ask him what had happened because from what the police had told me, they told me something real sketchy and I didn't know what had happened even and I asked him what had happened and he just kept saying over and over to me, `I got my billfold back.' And I said, `What are you talking about?' And he said, `I got my billfold back.' And when I talked to the policemen, they told me there had been  when they told me about there being a fight, I said, `Was ' inquired of them if it was a white man or black man and they said that it was a white man and so I said to him, I said, `What do you mean your billfold?' I said, `It was supposed to have been black men that robbed you.' And he said, `Well, I don't care. I don't know how he got it, but he had it and I got it back.'
"Q. Would you describe your husband's physical state at that time?
"A. He was really drunk then."
Dr. Donald C. Guild, Director of Forensic Psychiatry, Mississippi State Hospital, personally interviewed and examined the defendant at the Hospital. He also referred defendant to Dr. C.S. Stanley, the staff psychologist at Whitfield, for extensive psychological testing. Dr. Guild had studied Dr. Stanley's findings from the tests given when he [Guild] testified:
"[I]t is my opinion that in these circumstances to a medical probability, he did not have the capacity for the alleged incident that occurred at that time.
.....
"I think that at the time of the crime he was in a state of such alcoholism that he had what we term as organic brain syndrome, confusion. It resembles a severe *1163 mental illness. It is temporary in nature and induced by alcohol. I think that at that time he was confused; he was disorganized; he rambled; he would not connect one statement to another; he would repeat himself; he was rather disorganized. I think also at that time he had the delusional belief that would come and go, back in and back out in different forms, that he, the victim of this act, was indeed the person that had relieved him of his wallet earlier. He was rather disorganized and this delusional belief was rather fragmented. It wasn't very well put together. He was quite disorganized from all evidence that we can gather.
.....

"I don't think he did know the difference between right and wrong." (Emphasis added).
Dr. Stanley, the staff psychologist, when offered as a rebuttal witness by the State, testified:
"I have trouble with the term steal, because in the state that he was in, he seemed to genuinely believe that he was taking back his own wallet." (Emphasis added).
Dr. Stanley answered questions of the district attorney:
"It would be very difficult, Mr. Peters, to resurrect that particular situation again, because a lot of things came together at once. His wallet had been stolen in the recent past. This  we have reason to believe this, that he really is telling the truth. He had a very interesting relationship with this minister in that it started off to be a friendly relationship and then all of a sudden, the minister, I think, changed that relationship by preaching at him... .
.....
"On the other hand, he has virtually no unconscious inhibitory controls. Thus, when he becomes intoxicated and his conscious controls slip, he must tend to be openly hostile, aggressive, and if provoked, assaultive. In view of his use of projection, it should be pointed out that as often as not, the provocation will be imaginary rather than actual. And I think this is what happened."
.....
"Q. So, in your opinion, there's just no way for us to really tell whether or not he could tell the difference in right and wrong, is that right?
"A. That's essentially correct."
The court asked this question:
"Did you testify that you, in your opinion, he genuinely believed that he was taking back his own wallet?"
And Dr. Stanley answered:
"I have no reason to disbelieve that  what he said or what was brought out in testimony that he really believed that he was taking back his own wallet. He was taking it back in a highly inappropriate manner, but I think he probably really thought that it was his wallet. This would be a characteristic of alcoholic paranoia.
"BY THE COURT: Is that your opinion in this case?
"A. I think so. Yes, sir, that is my opinion in this case, that he really did have the delusion that he was taking back his own wallet." (Emphasis added).
The heart of the defense was that the defendant did not have the specific intent to commit the crime of armed robbery, either because he was so drunk that he could not form the specific intent, or that he was acting under the delusion (admittedly imaginary) that Reverend Booth had robbed him of his wallet some two weeks before, and that he was merely taking back his own property.
The defendant is correct in his argument that specific intent is a necessary element of the crime of armed robbery.
In Thomas v. State, 278 So.2d 469 (Miss. 1973), this Court said:
"This Court has consistently reminded the Bench and Bar that specific intent to steal must be shown by the testimony in robbery cases.

*1164 "In Cooper v. State, 218 So.2d 874 (Miss. 1969) we said: `Specific intent must be shown under the armed robbery statute. Miss. Code 1942 Ann. § 2367 (1956).' 218 So.2d at 876.
"We said in Thomas v. State, 165 Miss. 897, 148 So. 225 (1933) that: `Under the law intent to steal is an indispensable element of robbery. ..." 165 Miss. at 902, 148 So. at 225. This is the general rule. See 77 C.J.S. Robbery § 22(a), at 462-463 (1952)." 278 So.2d at 472. (Emphasis added).
On August 2, 1976, eight days before the trial, the defendant filed a detailed motion to compel production and disclosure. On August 5, 1976, the court entered an order directing:
"[T]he State to disclose and, in the case of a tangible item, to produce for inspection and copying by the Defendant's counsel:
"1. All evidence, information, statements, documents, reports and all other matters pertaining or related to or connected with this case now in the possession and control of the State, when the same may be favorable to the Defendant and material to the issue of guilt or punishment and which in any manner may aid Defendant in the ascertainment of the truth." (Emphasis added).
The State failed to disclose, until after the trial was completed and the defendant convicted, two investigative reports: one by Hinds County Deputy Sheriff Billy Baldwin that Booth stated:
"[T]hat he [Kenneth McDaniel] started accusing him of being the one who robbed him some weeks earlier";
and the other investigative report by Hinds County Deputy Sheriff Griffin that Booth stated:
"That the Defendant, `had the little boy take his billfold from his pocket,' and that the Defendant `told the little boy "see if my driver's license is in his pocket",' and that the Defendant accused Joseph H. Booth `of being the person who had previously robbed him.'"
When testifying at the trial, Booth, on cross-examination, when asked the question: "Did he ever make mention that he thought you had his wallet?", said: "No, sir. No way. None."
In my opinion, the State committed fatal error when it failed to furnish these two investigative reports to the defendant in accordance with the lower court's order.
The statements of Booth made to Deputy Sheriffs Baldwin and Griffin on the night of the robbery, September 20, 1975, would have been invaluable to the defendant in refreshing Booth's memory when he testified on August 10, 1976, almost a year later, as to exactly what the defendant had said when he robbed him of his wallet. These statements of Booth on the night of September 20, 1975, were exculpatory of defendant and were very material on the issue of guilt or innocence of the defendant.
In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court said:
"We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196-97, 10 L.Ed.2d at 218. (Emphasis added).
This "material" standard is discussed in United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), wherein it is stated:
"The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the *1165 other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." 427 U.S. at 112-113, 96 S.Ct. at 2401-02, 49 L.Ed.2d at 354-55. (Emphasis added).
The Mississippi Uniform Criminal Rules of Circuit Court Practice cover this particular situation like a blanket:
"The prosecution shall disclose to each defendant or his attorney, upon request and without further court order, the following:
.....
"(6) Copy of any exculpatory material concerning defendant." Miss.Unif.Crim. R.Cir.Ct.Prac. 4.06 (1977), at pages 49-50. (Emphasis added).
I would reverse and remand for a new trial, on the ground that the State committed fatal error when it failed to disclose to the defendant, in accordance with the Circuit Court's order, the two investigative reports of law officers containing "exculpatory material concerning defendant."
PATTERSON, C.J., and SMITH, P.J., join in this dissent.
NOTES
[1] The Court voiced disapproval of the instruction, but only to the extent that it indicated the presence of such a degree of intoxication would automatically reduce the crime from murder to manslaughter. Subsequent cases have held no degree of intoxication will automatically reduce murder to manslaughter. Stokes v. State, 240 Miss. 453, 128 So.2d 341 (1961).
[1] There are at least five other states which hold that voluntary intoxication is not a defense to a criminal charge, and these states apply the rule as an absolute. These states are listed in 8 A.L.R.3d Voluntary Intoxication  Defense, 1236 at page 1240 (1966) as Georgia, Missouri, Texas, Vermont and Virginia. In some of the states the rule arises by statute and in others by judicial decision.