*755
 
 BARNES, J.,
 

 for the Court.
 

 ¶ 1. On October 81, 2006, a jury found Rena James Lawrence guilty of aggravated assault for shooting her husband, Joe Willie Lawrence. She was sentenced to ten years in the custody of the Mississippi Department of Corrections, followed by five years of post-release supervision. Rena was also ordered to pay a fine, all court costs, and restitution to the victim. Aggrieved, Rena now appeals and asserts three issues: (1) whether the jury’s verdict was against the overwhelming weight of the evidence; (2) whether the trial court erred in granting the State’s jury instruction regarding voluntary intoxication; and (3) whether the accumulation of errors constituted reversible error. We find no error and affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. On April 19, 2006, Joe Willie and Rena had been married a year and four months and were living on Harris Road in Starkville, Mississippi. After work, Rena went to visit her husband’s aunt, Lillie B. Bell, who lived nearby. Many family members, friends, and neighbors had gathered at Bell’s house to provide comfort and prepare food as Bell’s daughter had recently died.
 

 ¶ 8. State witness Minnie Tate, who was at the gathering but did not know Rena personally, testified that Rena was initially “real nice, real sweet.” However, after the arrival of more friends, particularly a young man in a newly painted car, Rena’s demeanor changed. Rena began shouting profanity at the young man, sitting on the young man’s car, and placing a beer can on it. Tate said Rena was holding a beer and a blue cup. As the night progressed, Tate said Rena was “acting weirder than I ever s[aw] her act.” Rena began harassing two of the neighborhood boys, slapping one and chasing another. Rena next went into Bell’s house and began harassing a little girl named Ashley. Rena pulled on Ashley’s ponytails, jerking her down backwards to the floor. After Ashley started crying, Rena was confronted by Joe Willie, who asked Rena why she was acting this way.
 

 ¶ 4. Joe Willie testified that he went to Bell’s house after getting off work. When he arrived at his aunt’s house, Joe Willie could hear Rena’s voice over the other voices. He said Rena was arguing with some young man about his car. Joe Willie stated that after talking with Rena, they went inside Bell’s house and discussed his leaving his previous job because the business closed. Joe Willie asserts that a little while later, he had just begun a discussion with a relative about his job situation when he heard Ashley crying. An argument ensued between Joe Willie and Rena regarding Ashley’s crying; so the couple went home. Joe Willie told Rena she needed to sober up and go to her mother’s house to “sleep this off.”
 

 ¶ 5. Testimony is in dispute as to the events that transpired when the couple returned home, but it is undisputed that the arguing continued, and Rena shot Joe Willie. His version of the incident is that Rena retrieved her .380 caliber pistol from a briefcase and put it in her pocket. Their argument progressed, and she threw beer in his face and scratched him on the face with her fingernails. He pushed her on to the bed. When he let her up, Rena pulled the gun from her pocket and shot him at close range in the abdomen. Joe Willie denied hitting Rena in the face until after he was shot, at which point he “went blank” and “started beating on her.” He disarmed her and put the gun to her head. He then put the gun down, walked outside, and told onlookers to call 911.
 

 
 *756
 
 ¶ 6. Rena testified that before the shooting, she was merely “playing” with the children and did not harm them. According to Rena, Joe Willie was jealous and became enraged when she spoke to the men outside regarding the car. Once they returned home, Joe Willie asked her to leave his house; so she started packing. She packed the pistol for her safety. When Joe Willie started beating her on the face, she shot him one time in the abdomen in self-defense. However, he was able to take the pistol from her. As she was leaving, Joe Willie knocked her off the porch. On cross-examination, she admitted to having three or four beers that evening starting at approximately 5:30 p.m.
 

 ¶ 7. After neighbors heard the shots, Rena was seen coming from the house, falling off the porch, getting up, and getting into her car. Tate testified that as Rena was driving off, Rena said, “y’all better come get [Joe Willie].... You [are] lucky I didn’t shoot him in his head.” Tate stated that as Rena left the scene, she did not appear to be in pain and did not ask for assistance. Deputies testified that they received a call from dispatch at approximately 8:27 p.m. that a shooting had occurred on Harris Road, and that the suspect had fled the scene in a vehicle.
 

 ¶ 8. Deputies stopped the car driven by Rena at a nearby intersection. Because it was unknown whether Rena possessed a weapon, the deputies drew their weapons and ordered Rena out of the car. Deputy Leslie West and the other deputies testified that Rena’s demeanor was uncooperative during the arrest. Deputy West also testified that he could tell Rena had been drinking alcohol, and Rena admitted to him that she had drunk several beers. The deputies subsequently placed Rena in handcuffs and into Deputy West’s patrol car to be transported to the jail. Deputy West stated that when they passed the scene of the crime, Rena stated that she shot Joe Willie. While in the patrol car, Rena told Deputy West that her eye and leg hurt because her husband had punched her in the eye and pushed her off the porch. At booking, it was noted one of her eyes was swollen.
 

 ¶ 9. Approximately three hours after Rena arrived at the jail, Deputy William Ford was advised to administer an intoxi-lizer test to her. Because Rena was driving a car when she was stopped, the test was administered to determine her blood alcohol content. The result of the test showed a blood alcohol content of 0.13. On the following morning, while conducting cell check, the jailers noticed that Rena’s eye was badly bruised and swollen. After the sheriff observed Rena’s condition, she was released on bond so that she could seek medical assistance.
 

 ¶ 10. Thereafter, Rena was indicted by an Oktibbeha County grand jury for aggravated assault pursuant to Mississippi Code Annotated section 97-3-7(2) (Rev. 2006). On October 31, 2006, a jury found Rena guilty of aggravated assault. The trial judge sentenced her to ten years in the custody of the Mississippi Department of Corrections, followed by five years of post-release supervision. Rena was also ordered to pay a fine of $1,000 and restitution to Joe Willie in the amount of $45,632.63 for his medical expenses related to the injuries he sustained. Rena filed a motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a motion for a new trial, which was denied.
 

 ANALYSIS
 

 I. WHETHER THE JURY VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
 

 ¶ 11. On appeal, Rena asserts that the trial court erred in denying her motion
 
 *757
 
 for a new trial. She contends that to return a guilty verdict, the jury had to believe that: (1) she and Joe Willie were involved in a physical altercation, but Joe Willie did not strike her; (2) he withdrew from her immediate presence; and (3) then she shot him. Moreover, Rena argues that the jury had to believe it was only after she shot Joe Willie that he beat her on the face, wrestled the gun away from her, and held it to her head. Yet, she claims she shot him in self-defense after he threw her on the bed and began beating her. Rena asserts that no one else was present to witness the beating or the shooting, nor did the State present forensic or expert testimony as to the wounds or the gunshots. Rena claims Joe Willie’s account of the events are “simply preposterous” and “cannot be credited beyond a reasonable doubt.”
 

 ¶ 12. When reviewing the denial of a motion for a new trial, this Court will “only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.”
 
 Bush v. State,
 
 895 So.2d 836, 844(18) (Miss.2005) (citing
 
 Herring v. State,
 
 691 So.2d 948, 957 (Miss. 1997)). The appellate court sits as a thirteenth juror with the discretion to grant a new trial only in exceptional cases where the evidence preponderates heavily against the verdict.
 
 Id.
 
 (quoting
 
 Amiker v. Drugs For Less, Inc.,
 
 796 So.2d 942, 947(¶ 18) (Miss.2000)). Reviewing the trial court’s decision to deny a motion for a new trial, the appellate court weighs the evidence in the light most favorable to the verdict.
 
 Id.
 
 (citing
 
 Herring,
 
 691 So.2d at 957).
 

 ¶ 13. Despite the fact that the witnesses’ versions of the events that transpired on April 19, 2005, differ, the jury found Rena guilty of aggravated assault. In this case, the jury had to make a credibility decision as to which version of the story to accept. After a thorough review of the record, we find that allowing the verdict to stand does not sanction an unconscionable injustice.
 

 ¶ 14. At trial, evidence was presented that Rena had been drinking on the night in question and was in a combative mood before the altercations with her husband, as evidenced by her encounter with the young man in the freshly painted car and the altercation with the children. While there were no other eyewitnesses to the shooting besides Rena and Joe Willie, weighing the evidence in the light most favorable to the verdict, we find it is plausible the jury could have believed Joe Willie’s version of events over Rena’s and determined that Rena did not shoot Joe Willie in self-defense. Furthermore, testimony by Deputy West suggests Rena was not acting in self-defense. While transporting Rena to the jail, Deputy West passed the scene of the crime, and Rena voluntarily responded, “that’s where I shot that n* * * * However, Rena never stated before her arrest, during her transport to jail, or after arriving at the jail, that Joe Willie was trying to kill her, harm her, or that she shot him while defending herself.
 

 ¶ 15. As the trier of fact, the jury found that the overwhelming weight of the evidence showed that Rena deliberately and knowingly shot Joe Willie without authority of law and not in necessary self-defense. We find no error in this regard. Thus, the trial court did not abuse its discretion in denying the defendant’s motion for a new trial.
 

 II. WHETHER THE TRIAL COURT ERRED IN GRANTING THE STATE’S JURY INSTRUCTION S-4 ON VOLUNTARY INTOXICATION.
 

 ¶ 16. Rena alleges that the trial court erred in granting the State’s jury
 
 *758
 
 instruction S-4, over the defense’s objection, on voluntary intoxication. Rena argues that the trial court was not justified in granting a voluntary intoxication jury instruction because she did not claim voluntary intoxication as a defense, and she did not present any evidence at trial of being intoxicated. Instead, Rena’s sole defense is that she shot Joe Willie in self-defense to stop him from beating her.
 

 ¶ 17. Jury instruction S-4 reads:
 

 The Court instructs the Jury that voluntary intoxication from alcohol and/or drugs is not a defense to a crime. If a Defendant, when sober, is capable of distinguishing between right and wrong, and then voluntarily intoxicates herself by using alcohol and/or drugs, and deprives herself of that ability, then she is criminally responsible for any offenses committed while in that condition.
 

 Therefore, if you find from the evidence in this case beyond a reasonable doubt, that the Defendant voluntarily intoxicated herself through the use of alcohol and/or drugs, and then committed the offense for which she is charged, then that intoxication in no way relieves her of criminal responsibility.
 

 ¶ 18. In granting the instruction over the objection of defense counsel, the trial judge stated that there was evidence in the record supporting the grant of the instruction because the defendant had consumed alcohol and had tested positive for the use of alcohol some period of time after the incident. The trial judge acknowledged that while Rena was not relying on intoxication as a defense, the instruction was necessary to explain to the jury that the consumption of alcohol did not relieve her of criminal responsibility, nor did it provide her more leniency in her self-defense claim.
 

 ¶ 19. This Court’s standard of review regarding challenges to jury instructions is as follows:
 

 Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case, however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.
 

 Austin v. State,
 
 784 So.2d 186, 192(¶ 18) (Miss.2001) (citing
 
 Humphrey v. State,
 
 759 So.2d 368, 380(¶ 33) (Miss.2000)). “[I]f the instructions fairly announce the law of the case and create no injustice, no reversible error will be found.”
 
 Williams v. State,
 
 803 So.2d 1159, 1161(¶ 7) (Miss.2001) (citing Hi
 
 ckombottom v. State,
 
 409 So.2d 1337, 1339 (Miss.1982)).
 

 ¶ 20. Jury instruction S-4 is an expression of the rule articulated in
 
 McDaniel v. State,
 
 356 So.2d 1151, 1161 (Miss.1978) (Sugg, J., specially concurring), which states voluntary intoxication does not negate criminal responsibility. In
 
 McDaniel,
 
 the defendant’s sole defense, which the supreme court rejected, was that he was intoxicated and could not distinguish right from wrong; therefore, he could not form the requisite intent for armed robbery.
 
 Id.
 
 at 1153-54. In our case, Rena relies on
 
 Taylor v. State,
 
 597 So.2d 192 (Miss.1992) to support her contentions that the jury instruction was improper. In Taylor; the supreme court reversed Taylor’s murder conviction due to a jury instruction granted to the State. The jury instruction required the jury to find Taylor guilty of murder unless the jury entertained reasonable doubt as to whether the killing was done in self-defense.
 
 Id.
 
 at 194. However, Taylor’s sole defense
 
 *759
 
 was that the killing was an accident.
 
 Id.
 
 at 193-94. The supreme court reversed and remanded because no claim of self-defense was made, nor was any evidence of self-defense offered. The court concluded that the jury instruction was misleading as it prejudicially deflected the jury’s attention away from the defendant’s actual, sole defense of accident.
 
 Id.
 
 at 194-95. Furthermore, in
 
 Taylor,
 
 the evidence was circumstantial, and the court reasoned that were the jury to consider an extraneous matter, “the risk of a misdirected verdict bec[ame] intolerably high.”
 
 Id.
 
 at 195.
 

 ¶ 21. However,
 
 Taylor
 
 is distinguishable from the case at bar. While Rena’s sole defense was self-defense, the jury instruction on voluntary intoxication was not presented as an alternative defense, but as the trial judge explained, the instruction was given to explain to the jury that the evidence of Rena’s intoxication could not relieve her of criminal liability for the aggravated assault. Although Rena alleges that she was not intoxicated, there is evidence to suggest the contrary, and she even admitted on the stand to having three or four beers.
 

 ¶ 22. We find
 
 McGowen v. State,
 
 859 So.2d 320 (Miss.2003) instructive. The Mississippi Supreme Court held that a voluntary intoxication instruction did not confuse the jury or divert attention from McGowen’s defense of total innocence for the charge of capital murder; rather, it informed the jury that McGowen’s culpability was not lessened because of his voluntary intoxication.
 
 McGowen,
 
 859 So.2d at 343(¶ 81). Likewise, we find that the voluntary intoxication instruction here does not cancel out or confuse the jury on Rena’s own theory of self-defense. Furthermore, since this case was not a circumstantial evidence case, as in
 
 Taylor,
 
 and there was evidence presented of possible intoxication, the jury instruction was not interjecting an extraneous matter that could intolerably heighten jury confusion.
 

 ¶ 23. We find the trial court did not err in granting the voluntary intoxication jury instruction.
 

 III. WHETHER THE PREVIOUSLY DESCRIBED ERRORS, EVEN THOUGH FOUND TO BE HARMLESS INDIVIDUALLY, CONSTITUTE REVERSIBLE ERROR WHEN ACCUMULATED.
 

 ¶ 24. Rena argues that even if the above errors are found to be harmless when considered alone, they nonetheless constitute reversible error when taken together. Therefore, her conviction should be set aside and the case remanded for a new trial.
 

 ¶ 25. This Court has the discretion to determine, on a case-by-case basis, whether errors, although not reversible standing alone, “when considered cumulatively require reversal because of the resulting cumulative prejudicial effect.”
 
 Byrom v. State,
 
 927 So.2d 709, 730(¶66) (Miss.2006). We find no such errors in the present case.
 

 CONCLUSION
 

 ¶ 26. We find that the verdict was not against the overwhelming weight of the evidence presented at trial, and the trial court did not err in granting a voluntary intoxication jury instruction. Accordingly, we affirm Rena Lawrence’s conviction and sentence.
 

 ¶ 27. THE JUDGMENT OF THE CIRCUIT COURT OF OKTIBBEHA COUNTY OF CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF TEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS,
 

 
 *760
 
 WITH FIVE YEARS OF POST-RELEASE SUPERVISION, PAYMENT OF RESTITUTION OF $45,632.63 AND FINE OF $1,000, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.