LONG *v.* STATE.

(Division B.   May 9, 1932.)

[141 So. 591.   No. 29884.]

**Osborn & Witty,** and **Gardner, Odom & Gardner,** all of Greenwood, for appellant.

Means Johnston and Richard Denman, both of Greenwood, for the state.

Argued orally by **F. M. Witty**, and **A. F. Gardner**, for appellant, and by **Means Johnston**, and **W. D. Conn., Jr.**, for the state.

**Ethridge, P. J.**, delivered the opinion of the court.

The appellant, J. J. Long, Jr., was indicted at the November, 1931, term of the circuit court of Leflore county, Mississippi, for the murder of Elmer Stowers, and convicted of manslaughter, and sentenced to five years in the penitentiary, from which he appeals.

The appellant says that he was engaged in farming and lived alone, being a single man; that, prior to the killing, Stowers approached Long in a barber shop and asked him what he was going to do Tuesday night, to which Long replied "nothing, why," and Stowers stated that he wanted to bring out some girls and some liquor, and that Long told him to go ahead. On the night of the killing, Tuesday, Elmer Stowers, with his friend Ben Kinney, brought two young women and some liquor to Long's residence; being driven to the place and accompanied by an Italian, Rustici, called in the record "the dago." Prior to reaching Long's house, the parties had procured some coca cola and had drunk some liquor. Apparently, Long had forgotten the date, for when they arrived at his house he was preparing to retire; it being then a few minutes before ten p. m. After entering Long's residence, the parties and the appellant drank more liquor; the appellant drinking more than the others. They listened to the radio and danced some, and the appellant then fixed a room for Kinney and one of the young women, and they went into this room and went to bed. Long had taken his pistol from under the pillow at the time of preparing this bed and laid it on a dresser

in the room. Later, Long made efforts to date the other woman, who seemed to have been Stowers' friend, and she rejected his propositions. They then returned to the living room and had a game of cards, the appellant in the meantime having become very drunk, as had also others of the party. Kinney and the woman with him had gotten up and returned to the living room, and the women expressed desires to go home as it was then approaching one o'clock. The appellant had returned to the bedroom where he left his pistol, procured same, and the keys to the car operated by Rustici, and he and Rustici went into the bathroom near the living room where most of the parties were, after having agreed that they would not let the girls leave until they submitted to their wishes. The appellant then went into the living room with the pistol and stated to one of the women that nobody could leave until they got ready for them to leave, and asked which she was going to bed with, he or the dago. Some one motioned the negro servant who was present waiting on the appellant to take the pistol away from the appellant, and the negro approached, but the appellant pushed him away, and the negro did not secure the pistol. The deceased, Stowers, then requested Long, the appellant, to put away the pistol, which he did not do. Stowers then stated to Long, "You have a gun, and I haven't anything, but I have more nerve than you have," and took a step toward Long, and Long then fired the pistol killing Stowers practically instantly. Rustici, at the time this shooting took place, was in the bathroom vomiting, and did not hear anything, or know what had happened until he was told. After the first shot was fired, killing Stowers, the appellant turned the gun away and fired a second shot into the floor.

After the shooting, Rustici, Kinney, and the two women left. The negro servant and the appellant, Long, then got the deceased into a car and carried his dead

body to Itta Bena, to the home of appellant's brother-in-law, who put the appellant to bed, and phoned for the sheriff. The sheriff came out that night and got the appellant up and started an investigation of the matter. The appellant partially told the sheriff how it happened, but stated that he did not then care to talk about it as he was very drunk. The sheriff was introduced as a witness, and this testimony was objected to. The sheriff, after putting Long back to bed, went to Long's residence to investigate the situation there, and found Long's pistol on the dresser with two empty chambers, and the pistol was cocked over another loaded cartridge.

There is but little conflict in the version of the different witnesses as to what transpired. It appeared that Long and Stowers, both unmarried men, had been friends for about five years, and their relations were intimate. Long testified that he did not remember anything that happened between the time he and the young woman returned to the room after they had been on the gallery where he made the propositions to her, and the time of the killing; that he had only two glimpses of things that happened in the interim. The killing, as stated, occurred about one-thirty a. m. and there must have been an hour or an hour and a half time in which he was pretty well intoxicated. Some witnesses testified that he knew what he was doing, and others that he was very drunk. Long himself testified that he did not know anything, except that he remembered seeing Kinney and one of the young women in bed, and remembered some one vomiting in the bathroom.

The appellant's defense was that he killed Stowers unintentionally, that it was an accident, that there had been no words between them, and that they had been strong friends for a long while; and the contention here is that the evidence is insufficient to sustain a verdict of manslaughter, and that the court refused to submit the theory of accidental killing to the jury. That one of the

jurors was related to one of the prosecuting attorneys is contended, and that this was not known to the defendant until the motion was made to quash the panel prior to the verdict, and also that the district attorney stated in his closing argument that it was his deliberate judgment that the killing was manslaughter under the evidence in the case.

We think the evidence was ample to support the verdict of manslaughter. Indeed, we think the jury reached the correct conclusion in finding the verdict of manslaughter, although there is evidence to support a verdict of murder, which, if acted upon, might be affirmed.

There is no theory of accident which can be reasonably entertained upon the proof in this case. Section 989, Code of 1930, provides that:

"The killing of any human being by the act, procurement, or omission of another shall be excusable:

"(a) When committed by accident and misfortune, in lawfully correcting a child or servant, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent;

"(b) When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation;

"(c) When committed upon any sudden combat, without undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel or unusual manner."

Whether the appellant intended to fire the gun or not, it was fired unlawfully if he pointed the gun at the deceased. He was clearly not doing a lawful act, and his conduct was not lawful in what he was doing at the time, and throughout the whole proceeding. The statutes of the state make it a crime to point a gun at another, except in the discharge of official duty or in necessary self-defense. The pointing of the gun in the case at bar was not in self-defense, and not in the discharge of of-

ficial duty, and was not for any lawful purpose. It was distinctly and clearly an unlawful act; and, as the killing resulted from the pointing of the gun, whether discharged intentionally or not, it would make the appellant guilty, at least, of manslaughter. When a person is doing an unlawful act, or doing a lawful act in an unlawful manner, and the doing of the act results in the death of another person, the result is not excusable or justifiable; and if not malicious or premeditated, or done under circumstances showing a disregard for social duty, or bent on mischief, it would amount to manslaughter.

It is no defense to a crime, so far as the manslaughter feature is concerned, that the party was so drunk, if he was in fact so drunk, as to not know the nature of the crime he was committing. His being drunk was his voluntary act. He deliberately and purposely drank the liquor, and prepared and consented for the party at which the liquor and women were to be used. In no circumstances could he be justified in placing himself in such intoxicated condition that he would not know the nature of his act, and then set up his voluntary act in bringing about this condition as a justification or excuse of what he did.

This court has frequently decided that voluntary intoxication is no defense to a crime, unless a specific intent is necessary to constitute crime, and that a person cannot take advantage of a situation he has placed himself voluntarily in. Melton v. State, 155 Miss. 659, 124 So. 802; Butler v. State (Miss.), 39 So. 1005; Gordon v. State (Miss.), 29 So. 529; Kelly v. State, 3 Smedes & M. 518, and decisions of other states to the same effect.

It is urged that it was error to permit the sheriff to be examined as to statements made by the appellant to the sheriff, on the morning of the killing, at Itta Bena. The sheriff had testified that the appellant had a splendid reputation for peace in the community in which he lived. He was asked as to the statement by the appellant that he would rather not talk about the matter just then, as

he was too drunk; and the objection to this statement was overruled; it was admitted, and the sheriff's recollection was that the appellant started to tell him about how the matter occurred, and then said he preferred not to talk about it as he was too drunk.

It is urged that admitting this evidence was equivalent to forcing the appellant to testify against himself. We do not think so. The appellant had the right to refuse to talk, and it is not reversible error for an officer to ask a man about a transaction in which he is involved, and to state that the man declined to discuss the matter.

We do not see any harm that could result to the appellant from declining to talk under the admitted fact that he was then drunk; at least, intoxicated to such an extent that his mind might not be clear. The jury is composed of men of common sense, and they well know that a person in that condition would be disinclined to talk when his recollection was clouded by intoxication. Certainly, it is not reversible error in this case.

It is objected that the court erred in permitting the district attorney, over objection, to state that his deliberate judgment was that the defendant was guilty of manslaughter, and, when the court declined to exclude it, he repeated this statement. This statement was within the limitation of legitimate argument. While it might be more prudent and better ethics to draw inferences, without stating his personal opinion, from the testimony, it was permissible for him to state his conclusions to the jury. The very purpose of an advocate is to help the jury draw conclusions from the evidence and to make suggestions of what is a proper conclusion, and to give such reasons as occur to counsel as to what conclusions should be so drawn.

In the case at bar, there was evidence from which the jury could infer deliberate malice; that is, malice known as legal malice. It is not necessary that there be actually a willful intent to make a killing murder; but if a man

deliberately kills another, or does an act resulting in killing another, with knowledge of its probable consequences, and intentionally does such act, he does it with malice aforethought.

While the jury could have found a verdict of murder, it is manifest from all the testimony that the appellant's mind was largely, if not entirely, overcome by liquor. The frank admission by the district attorney that in his judgment manslaughter was the proper verdict operated favorably under the facts in this record to the appellant, because there is no testimony in the record from which the jury could find he was innocent.

It is also argued that the court erred in overruling the motion for a mistrial and a venire de novo, because the juror, Trusty, was related to the attorney, Mr. Denman. The motion was not formally made and sworn to, but was dictated into the record, in which it was stated that the juryman, J. E. Trusty, was related to Richard Denman, one of counsel for the state; being a first cousin. The relationship was proven on this motion, but Denman's recollection was that counsel for the appellant did not ask as to the relationship, and that the juror did not deny his relationship. One of the attorneys for the appellant testified to a contrary recollection. It was shown that the attorney for the state knew of the relationship, but only one of the four attorneys representing the appellant testified on the matter, and the appellant himself did not testify upon this proposition. It was necessary for the attorneys to make formal affidavit that they did not have such knowledge, and that, if they had had such knowledge, they would have exercised the right of peremptory challenge, or should have taken the stand and testified upon it before the court. The relationship of the juror to one of the attorneys in the case is not a legal disqualification, and a challenge for cause could not be maintained because of such relationship.

Under the evidence on this point, and under the facts on the merits of the case, it cannot be reversed for this alleged error.

In other words, in the first place, the trial judge was present and heard what was asked the jurors, and therefore he was in a better condition to pass upon the recollection of counsel as to what occurred then, and we cannot reverse him because thereof; and, in the second place, on the facts in this record, we do not think the defendant could be rightfully acquitted, and if the cause was reversed, the jury would be likely to, and should in our opinion, sustain another conviction of manslaughter; and it would therefore be doing a fruitless thing to reverse this cause.

We have carefully examined the instructions granted the state, and we think they are proper and free from objection applied to the facts of this cause.

There is one instruction for the defendant that might be in conflict with the state's instructions; but, if it is in conflict, it is erroneous when applied to the facts of this cause, and the appellant could not complain of error which the court committed at his instance and request. This instruction reads as follows: "The court instructs the jury for the defendant that unless satisfied beyond a reasonable doubt to a moral certainty, that the defendant intentionally killed the deceased as charged in the indictment, then it is the duty of the jury to promptly find the defendant not guilty."

If the defendant killed the deceased unlawfully, as the evidence shows he did, it would be immaterial that his mind was impaired by intoxication to a degree that he could not intentionally do it; if he destroyed his capacity to intend the consequences that resulted, and if the act from which the killing flowed was unlawful, it would be manslaughter.

If the instruction was intended to reach the murder charge in the indictment, it might be proper, but the in-

dictment not only charges murder, but also manslaughter, and the instruction is incorrectly drawn as applied to the facts of this case.

We find no reversible error in the record, and the judgment is affirmed.

Affirmed.