530 So.2d 129 (1988)
Willie O'BRYANT
v.
STATE of Mississippi.
No. 57691.
Supreme Court of Mississippi.
July 13, 1988.
*130 James W. Burgoon, Jr., Fraiser, Burgoon & Abraham, Greenwood, for appellant.
Edwin Lloyd Pittman and Mike Moore, Attys. Gen. by Pat Flynn, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and PRATHER and ANDERSON, JJ.
HAWKINS, Presiding Justice, for the Court:
Willie O'Bryant appeals his conviction in the circuit court of Leflore County of the murder of his wife Mrs. Josie O'Bryant and sentence to life imprisonment.
The first issue we address on this appeal is whether O'Bryant was entitled to an instruction authorizing the jury to acquit him if they believed the death of his wife was accidental. Because O'Bryant was engaged in an unlawful act at the time his wife was shot, such instruction was properly refused.
The other issue, which we also find to be without merit, is whether the verdict of the jury was against the overwhelming weight of the evidence. Accordingly, we affirm.

FACTS
O'Bryant and Mrs. O'Bryant had been married 24 years. Five sons, ranging in age from 12 to 23, had been born of their marriage. O'Bryant was employed as a rig superintendent on an oil drilling barge working inland, working seven days and off seven days. In July and August, 1985, he had been laid off from work.
On Sunday, August 11, 1985, he and Mrs. O'Bryant had been separated two months, and he had attempted to talk to her by telephone to get her to come home. He said he "loved her deeply." He had also enlisted the help of acquaintances to get her to return. Nina Fillyaw, Mrs. O'Bryant's best friend, testified that O'Bryant called her repeatedly trying to locate or communicate with his wife. Nina testified that O'Bryant once said he would kill Mrs. O'Bryant if he caught her with another man. In subsequent phone conversations, O'Bryant assured Nina he would not harm Mrs. O'Bryant.
Mrs. O'Bryant had been staying with different friends. On Friday, August 9, the friend Mrs. O'Bryant was staying with left town. On Saturday, the air conditioning in the house ceased to function. Mrs. O'Bryant had to find another place to stay and went to Rick Milam's apartment.
Rick Milam testified that when O'Bryant and the O'Bryant's youngest son, Jason (J.J.), parked by the apartment building the evening of August 11 and J.J. knocked on the door twice asking for his mother, Mrs. O'Bryant hid in the back of the apartment. Rick answered the door both times and told J.J. that his mother was not at the apartment. O'Bryant got the same response when he went up and knocked on the apartment door.
At 10:05 p.m. on August 11, the Greenwood Police Department received and recorded a phone call from Josie O'Bryant. The tape recorded Josie stating her location at a third floor apartment on East Washington Street and saying, "Someone is trying *131 to break in here." The log of radio calls reflected that the police department broadcast a call at 10:07 p.m. directing patrolmen to respond to Mrs. O'Bryant's call for help. Lieutenant Vernon Hemphill was already near Mrs. O'Bryant's location; the log reflects that he arrived at 10:09.
O'Bryant spotted the police car coming down the street as he and his youngest son, Jason (J.J.) O'Bryant, were getting in the car to drive the two blocks to the police department to get help. O'Bryant got out of his car and went up to the patrol car.
Hemphill, the first patrolman to arrive, observed a white male in front of the apartment building. Hemphill got out of his car. The man walked toward Hemphill and said calmly: "Officer, you might as well arrest me." Hemphill asked, "For what?" He replied, "I just shot my wife." O'Bryant showed Hemphill where Josie's body was and Hemphill radioed for an ambulance and the coroner. He asked O'Bryant where the location of the gun was and O'Bryant took Hemphill to his car and got the gun from under the seat.
Three other policemen responded to the radio call. George Lee, Charlie Barr and Lewis Grones testified that the back door to Milam's apartment appeared to have been forced open. Their descriptions of the door knob were that the lock was pulled away from the door facing, the framing around the knob was loose and crooked, the plate around the handle was loose, and wood was splintered and "busted away from around the lock." One officer said the door would lock if slammed shut. Two others said they could not tell when the door had been forced open and did not know if the casing or knob was loose before August 11.
On the second floor landing in front of an apartment door, one policeman found a chip from the butt of a pistol that fit O'Bryant's Ruger pistol grip. Another officer found a wood chip from a pistol butt on the middle landing between the first and second floors. This chip fit the pistol grip on the other side of the Ruger. When Officer Hemphill took the gun from O'Bryant, he noticed that the handles were very loose.
O'Bryant testified that he was carrying the new model Ruger.357 Magnum single-action revolver with his finger on the trigger, but said, "I never, during any occasion, cocked the hammer." An arms expert said two things were required for the gun to fire: the hammer had to be pushed back and released while the trigger was being squeezed at the same time.
Pathologist Kenneth Collins testified from his autopsy on the body of Mrs. O'Bryant that the cause of death was a gunshot wound to the head. He testified that the bullet entered under the chin and exited three inches above the right ear, penetrating the soft tissues of the floor of the mouth, the tongue and the roof of the mouth and entering the base of the skull causing extensive fractures of the skull and injury to the right side of the brain. Death was instantaneous. He also said that the absence of powder burns indicated that the gun was some distance away when fired, probably more than two feet. The pathologist noticed Mrs. O'Bryant's left arm bore a severe abrasion from a blunt injury that tore the skin, and another abrasion was on her left wrist.

O'BRYANT'S TESTIMONY
According to O'Bryant, Mrs. O'Bryant telephoned him about four o'clock that Sunday afternoon. He pleaded with her to return home, telling her he was to go back to work the following Thursday. He said that she finally agreed to come home and stay with the children while he was at work.
Around 7:30 that evening he took their youngest son, J.J., with him looking for Mrs. O'Bryant. As they drove by Rick Milam's apartment, J.J. told O'Bryant he thought he saw his mother through a window. O'Bryant stopped and saw Mrs. O'Bryant through a kitchen window, standing next to the sink.
O'Bryant drove down the street, turned around and came back and parked. At this time he also saw Milam in the apartment. J.J. went up to the apartment and returned *132 in a few minutes. J.J. then went back to the apartment and again returned. O'Bryant then went to the apartment himself, and knocked on the door. Milam opened the door and O'Bryant told him he wanted to speak to his wife. Milam replied that Mrs. O'Bryant was not there, that he had not seen her for two or three days, and did not know where she was.
O'Bryant left, drove around the block two or three times, and returned to the apartment. He said he sat there for about ten minutes, and saw Milam in the apartment. About two minutes later Milam and a man named Ashmore came out the front door, and he saw "Josie kind of stoop over and shut the door behind them."
O'Bryant then told Milam that he wanted to "talk with Josie," and asked Milam to take him up to the apartment and show him she was not there. Milam refused to do so. When Milam left, J.J. went back to the apartment and O'Bryant, in his car, followed Milam and Ashmore as they drove away. O'Bryant ceased following them and went by his house to get his gun. He returned to the apartment. O'Bryant testified as to what followed:
A. Well, I got out of the car and proceeded to go up to the apartment. I walked a few steps and I turned back, went back to the car and got my pistol out of the glove compartment and stuck it in my back pocket.
Asked why he got his pistol, he replied:
A. Well, I was aware of Rick Milam's reputation, and I didn't know where they had went or when they would be back, or if there was someone else in the apartment.
O'Bryant then testified as follows:
A. I knocked on the door. Nobody answered at first. I knocked again, and I called out, "Josie, I know you're in there. I want to talk to you." So she come and opened the door. I went in,, and she had backed up to the kitchen table, end of the kitchen table. I said, "Josie, what are you doing in this place?" And she said, "I have no place to go." And I said, "I love you, the kids love you, we all want you home. Come on. You can't stay in this place.," So I caught her by the hand and she went hysterical, just fighting and everything. I grabbed her around  it was over her right shoulder, her left arm, around her back and under her left arm, and I proceeded to pull her out. I told her that I would take her  she didn't have to go home with me, but I would take her somewhere else, anywhere she wanted to go. So she was fighting, trying to get away from me, grabbing anything she could get ahold [sic] to. When we finally reached the kitchen door, she just hooked her arm around the door  it was open  around the door, and I had to jerk her aloose [sic] from it. We finally made it out of the kitchen door and proceeded down the first set of steps.
Q. All right, sir, where was the gun?
A. The gun, I had it in my right hand, because during the struggle she had her right arm behind me, and I didn't want her to get ahold [sic] of it and I had pulled it out and held it in my right hand.
Q. All right, then tell us what happened.
A. We made it to the bottom of the first set of steps and she had got ahold [sic] of the railing, and I had to jerk her aloose [sic] from the railing real hard, to get her aloose [sic], and at that time she had lost her balance. I was trying to hold her up  she had kind of got around in the front of me, and we had stumbled and we fell down the steps, and during this time the gun went off and we both landed at the bottom of the second steps.
Q. All right, sir. Did you know at that point that she had been hit?
A. No, sir.
O'Bryant denied Nina Fillyaw's testimony and testified that he had never threatened to kill Mrs. O'Bryant. He admitted that Mrs. O'Bryant did not want to leave *133 Milam's apartment. He stated that he did not intentionally kill his wife. Three policemen noticed a trail of small drops of blood leading up the stairs into Milam's apartment which O'Bryant attributed to the two abrasions on his wife's arm and to a cut on his hand that occurred while they were in the apartment. When asked why he told the policeman to arrest him if the killing had been accidental, O'Bryant answered, "It was an accident. She was still hurt ... I didn't think about it."

LAW
O'Bryant was refused the following instruction:
INSTRUCTION NO. D-5
You are instructed that under the law, the killing of any human being by another is excusable when committed by accident or misfortune in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent.
If you believe from the evidence that at the time and place testified about the gun was discharged by accident and misfortune thereby mortally wounding the deceased, Josie O'Bryant, at a time when the defendant, Willie O'Bryant, was doing a lawful act by lawful means with usual and ordinary caution with no malice or intent on his part toward the deceased and without any deliberate design on his part to effect the death of Josie O'Bryant, then the killing was excusable and the defendant is not guilty of either murder or manslaughter and it is your sworn duty to return a verdict of "not guilty."
The circuit judge did, however, in one instruction inform the jury that a killing without authority of the law "which is not justifiable or excusable," was either murder or manslaughter, murder when done with malice and deliberate design, and manslaughter when done without malice in the heat of passion.
The circuit judge also instructed the jury on manslaughter, telling them that if the shooting "was not excusable or justifiable," under what conditions they could return a verdict of guilty of manslaughter.
These instructions and two other instructions given O'Bryant are attached as an appendix.
O'Bryant's major assignment of error is that the circuit judge refused to grant Instruction D-5. We disagree.
This instruction was no doubt based upon Miss. Code Ann. § 97-3-17(a):
§ 97-3-17. Homicide  excusable homicide.
The killing any human being by the act, procurement, or omission of another shall be excusable:
(a) When committed by accident and misfortune in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent; .. .
It is, of course, an absolute right of an accused to have every lawful defense he asserts, even though based upon meager evidence and highly unlikely, to be submitted as a factual issue to be determined by the jury under proper instruction of the court. This Court will never permit an accused to be denied this fundamental right. See: Ward v. State, 479 So.2d 713 (Miss. 1985); Lancaster v. State, 472 So.2d 363 (Miss. 1985); Pierce v. State, 289 So.2d 901 (Miss. 1974).
An accused, however, is not entitled to an instruction based upon a defense not authorized by law. The question before us then is assuming there was a jury issue on whether Mrs. O'Bryant's death resulted solely from the pistol discharging as they struggled down the stairs, would this have entitled O'Bryant to a verdict of not guilty?
Clearly he was not entitled to this instruction under the statute. To have availed himself of this statute, it was necessary that he be engaged in a "lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent." O'Bryant, by his own testimony, was engaged in an unlawful act. Armed with a deadly weapon he made an assault upon his wife, and was dragging her, very much *134 against her will, from an apartment where she had a right to be. He had no legal right to drag her against her will from the apartment. Engaged in this illegal conduct with a loaded pistol in his hand, he has no right under the law to ask for an acquittal even had her death resulted  while he was thus engaged  "accidentally." Even if the killing was accidental, at most it would have reduced the crime from murder to manslaughter.
Our conclusion is not altered by O'Bryant's argument that he had the right as her husband to drag her from the apartment, as a father could forcibly remove a minor son. The unity of person that makes marriage something more than a mere formality prerequisite to legal co-habitation does not lend coverture or protection to the assault or battery of one's spouse. See State v. Herndon, 158 Fla. 115, 27 So.2d 833, 837 (1946) (Buford, J., dissenting).
In Wood v. State, 64 Miss. 761, 2 So. 247 (1887), the defendant, his brother and their friends got into an altercation with two Scott brothers. In the fracas one of the Scotts hit Wood on the head with a stick. Wood stabbed him with a knife. This Court held the trial court correctly refused an instruction based upon a "killing by accident or misfortune," because death resulted from use of a deadly weapon. 64 Miss. at 775, 2 So. at 249.
Long v. State, 163 Miss. 535, 141 So. 591 (1932), was a manslaughter conviction. At a drinking party in his house, involving some loose women, Long brandished a pistol. After refusing his servant's request to put it away, Stowers, one of the guests, requested Long to put the gun away, but Long refused. Stowers told Long he was not armed, but was not afraid of him. He then took a step towards Long, who fired the pistol, killing Stowers. At trial Long claimed innocence, that the killing was an accident, and that this issue should be submitted to the jury under § 989, Code of 1930, our present Miss. Code Ann. § 97-3-17. The trial court refused to grant such an instruction. We affirmed, stating:
When a person is doing an unlawful act, or doing a lawful act in an unlawful manner, and the doing of the act results in the death of another person, the result is not excusable or justifiable; and if not malicious or premeditated, or done under circumstances showing a disregard for social duty, or bent on mischief, it would amount to manslaughter.
163 Miss. at 547, 141 So. 591.
In Holmes v. State, 151 Miss. 702, 118 So. 431 (1928), Holmes was intoxicated and riding in a buggy. He got it into his head that the deceased, Lemmie Ginn, sitting on the side of the road with appellant's brother, had cursed Holmes' brother. The brother informed Holmes that Ginn had not cursed him. Holmes, brandishing a pistol, said he believed he would "shoot it off." According to the defense version, while Holmes' brother was attempting to wrest the gun from Holmes, Ginn was accidentally shot. The circuit court refused the following instruction:
The court instructs the jury for the defendant, that you are not trying the defendant for carrying a pistol, that you are not trying him for having whisky in his possession, and you are not trying him for being drunk, and notwithstanding any or all of these, still the deceased may have been killed by mere accident, and if you believe there was no deliberate purpose of premeditated design to kill the deceased, but that the parties were good friends and the killing was a mere accident caused by a scuffle over a pistol, then you must acquit the defendant, however deplorable it may be for a young boy's life to be lost under the circumstances.
151 Miss. at 709-710, 118 So. at 433.
In affirming, this Court held:
We do not think it was error to refuse this instruction, because it entirely omits the theory of manslaughter that might exist and which is not sufficiently negatived by the phraseology of the instruction. It is true that he was not being tried for having whisky, or for being drunk, or for shooting on the highway; but the absence of a deliberate purpose *135 or premeditated design to kill does not of itself entitle the defendant to an acquittal when he was engaged at the time in an unlawful act, the probable consequence of which was that a person might be killed, or suffer great bodily harm.
151 Miss. at 710, 118 So. at 443.
In Holmes, as in this case, the circuit court did grant another instruction authorizing an acquittal based upon an accidental shooting.
In Powell v. State, 279 So.2d 161 (Miss. 1973), the defendant, armed with a pistol at a tavern, tried to persuade his wife to leave her boyfriend and go home with him. The boyfriend told the defendant she was going with him, and the defendant was not going to do "a damn thing about it." The defendant hit the boyfriend with the pistol, knocking him down. While down, the defendant kicked him, and when the boyfriend attempted to get up, the pistol fired. We held § 2219, Mississippi Code of 1942, our present Miss. Code Ann. § 97-3-17, did not excuse an offense in the commission of which a deadly weapon was used.
Closely analogous is an Alabama decision, Jenkins v. State, 82 Ala. 25, 2 So. 150 (1887). Jenkins and the deceased were in a dice game and got into an altercation. According to Jenkins, having a knife in his hand, but not intending to use it, he grabbed the deceased's hat to induce him to return the money. The deceased grabbed the defendant's hand, and in jerking his hand away, he accidentally stabbed the deceased. Jenkins requested an instruction authorizing the jury to acquit if the stabbing was accidental. The trial court refused. The Alabama Supreme Court held:
The charge asked by defendant was rightly refused. Under the testimony most favorable to him, the defendant commenced the encounter, by attempting to snatch the hat of deceased from his head in a rude or angry manner. This was an assault  a misdemeanor; and if death ensued, although by misadventure, and not likely to ensue, the defendant would not be guiltless. He would ordinarily be guilty of manslaughter in the second degree, under the circumstances as detailed by himself. [citations omitted] The hypothesis of the charge, while, if believed, it may have required defendant's acquittal of murder, did not, when interpreted in connection with the testimony, demand his entire acquittal.
Dixon v. State, 104 Miss. 410, 61 So. 423 (1913), cited by O'Bryant, is distinguishable. In that case, Dixon, while drunk on a public highway, carrying a concealed weapon, discharged it. A bullet ricocheted and struck a young lady on a nearby porch. We held this unlawful conduct, which constituted three misdemeanors, did not deprive Dixon of the right to claim accident, and it was the jury's prerogative to determine whether the death was the natural or necessary result of the defendant's acts, or was an accident. Instead, the trial judge had instructed the jury that if the defendant was engaged in any of the misdemeanors the jury should return a verdict of guilty of manslaughter. In Dixon there was no direct assault upon the deceased. We have likewise examined the other authorities cited by O'Bryant and find them of no help to his argument.
Finally, O'Bryant argues that because the circuit judge did permit the jury to consider whether the death was "excusable" or "justifiable" in other instructions, he should have permitted O'Bryant to amplify or explain how the killing could have been excusable. The answer to this is that the circuit judge in inserting the words "excusable" or "justifiable" in the other instructions gave O'Bryant more of a break than he was entitled to under the law, from which O'Bryant's counsel presumably argued at length, and refusal to grant something further could in no way have prejudiced O'Bryant asserting a lawful defense. At the very best O'Bryant was guilty of manslaughter by his own version. The jury was fairly instructed on manslaughter, but chose to convict him, upon substantial competent evidence, of murder.

SUFFICIENCY OF EVIDENCE
O'Bryant's final assignment of error is that the verdict was against the *136 overwhelming weight of the evidence. The basic issue at trial was whether or not the shooting was accidental. If not, it was either murder or manslaughter to be decided by the jury. There was ample evidence in the record to support the jury's finding that death was not accidental and that he was guilty of murder. Galloway v. State, 342 So.2d 1306, 1308 (Miss. 1977); Breakfield v. State, 275 So.2d 860, 862 (Miss. 1973).
AFFIRMED.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.