ISHEE, J.,
 

 for the Court.
 

 ¶ 1. Johnny “Shug” Brown was convicted in the Circuit Court of Hinds County of murdering Violar “Shun” Bracey. He was sentenced as a habitual offender to life in the custody of the Mississippi Department of Corrections. Aggrieved by his conviction, Brown appeals. He asserts the following alleged assignments of error:
 

 I. Whether it was error to refuse defense jury instruction D-l, which instructed the jury on accidental homicide.
 

 II. Whether it was error to permit Dr. Stephen Hayne to testify.
 

 III. Whether the evidence was sufficient to support Brown’s conviction.
 

 IV. Whether Brown’s conviction is against the overwhelming weight of the evidence.
 

 Finding no error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. The victim in this case, Bracey, was shot in the head on the night of December 11, 2004. The killing happened in a motel on Highway 80 in Jackson, Mississippi. Brown was identified on a security camera checking into the motel with Bracey, and Cathy Williams observed him leaving the motel after the shooting.
 
 [1]
 
 As Brown passed her, he told her, “Queen Bee, I think I done killed my wife.” He then got into a white car and left. Williams told the employee at the front desk of the motel to check the room, at which point the employee found Bracey’s dead body. An arrest warrant was issued, and three days later, police, acting on a tip from one of Brown’s relatives, arrested him for Bracey’s murder.
 

 ¶ 3. Bracey’s friend, Demeka Griffin, testified that Brown came to Griffin’s house on the night of the incident to see Bracey. Griffin said that Bracey went outside a few times to talk to Brown. One time, she got angry and came back in the house after Brown threw liquor in her face. After that, Brown came back one last time, after which, Bracey left with him in her mother’s car. Griffin testified that it seemed like Brown was trying to fight Bracey and get her to leave with him.
 

 ¶ 4. Williams testified that she saw Brown leave the motel on the night of the incident. She saw blood on his shirt, but she did not notice him carrying a gun. According to her testimony, all Brown told her was that he thought he killed his wife. Williams did not go into the motel room, nor did she see anyone else go into the room. The motel employee who was working that night immediately checked the room after Williams informed him that there had been an incident. He called the police after he saw Bracey’s body on the bed. He said that Brown and Bracey had checked into the motel approximately thirty minutes earlier. He said that Brown had signed the registration card as “Tom Fisher” and did not have any identification on him when he checked into the motel.
 

 ¶ 5. Officer Paul Ray Hobson, with the Jackson Police Department, was dispatched to the motel on the night of the incident. Detective Kent Daniels videotaped the scene. Officer James Chambers also responded to the scene and took pictures of the victim’s mother’s vehicle after it was towed to the crime scene office.
 
 *919
 
 Katina Robbins, a forensic serologist with the Jackson Police Department, testified that Bracey had sex on the night she was killed. David Whitehead, a forensic scientist with the Mississippi State Crime Laboratory, testified concerning the gunshot residue found at the crime scene. In Whitehead’s examination, he stated that Bracey’s hands were properly bagged and sealed and that he found no residue on her hands. He said that he would have expected to find residue if Bracey had been struggling with a gun when she was shot. Starks Hancock, a forensic pathologist with the State Crime Laboratory specializing in firearms identification, testified that it was a .38 caliber projectile that killed Bracey. He said the most popular .38 caliber pistol was a .38 special. If it was a single-action, the gun would have needed to be cocked before firing, and if it was a double-action, the gun would have required more pressure to pull the trigger. Hancock thought it was unlikely that either type of gun could be accidentally fired.
 

 ¶ 6. Detective Perry Tate, with the Jackson Police Department,. responded to the crime scene following the shooting. He recovered the surveillance tape and the registration card from- the motel employee. Police found Bracey’s mother’s car, which Brown took after the shooting, ditched on the side of the road. According to Detective Tate, the .police went to Brown’s house and his girlfriend’s house, but they did not find him. Brown never called the police to inform them about the shooting. Three days later, the police were contacted concerning Brown’s whereabouts, and he was apprehended.
 

 ¶ 7. Keith Denson, an investigator with the Hinds County District Attorney’s Office, testified concerning letters that Brown sent , to Bracey while'Brown was previously incarcerated. The letters were written from January 1, 2004, through June 16, 2004. The letters reflected that Brown was upset with Bracey because she was seeing another man, known only as Ed. Brown was also upset because she had Ed’s name tattooed on her arm and because she had not sent Brown money while he was in jail. In one letter, Brown threatened to beat Bracey if she was seeing another man, and in three of the letters, he threatened to kill her.
 

 ¶8. The day following Bracey’s death, Dr. Steven Hayne performed an autopsy on her. He noted only one injury to the victim — a contact gunshot wound on the right side of her head, slightly above and in front of her ear. Powder residue in the wound and the tearing of the skin around the wound indicated that the gun was in contact with the victim’s head when it was fired. There was no trace of any blood spatter or gunpowder residue on Bracey’s hands, indicating that her hands were probably covered when she was shot and that it was unlikely that she had fired the weapon. Also, it appeared as if her body had been rolled over after she was shot.
 

 ¶ 9. Brown took the stand and testified on his behalf. He said that Bracey had always been upset with him ever since they had known each other. She was unhappy with the fact that he slept with other women and got another woman pregnant. Brown said that Bracey cut him on the arm one time when she was upset with him for sleeping with another woman. Brown also told of a time, approximately three weeks before the incident, when Bracey threatened him and sprayed him with mace. Brown said at the time of the incident, he was seeing Bracey, but they were not in a serious relationship because he was seeing other women, one of whom was expecting Brown’s child. According to Brown, Bra-cey became suicidal after she found out that Brown had gotten another woman
 
 *920
 
 pregnant, and he testified that Bracey had previously tried to overdose on pills.
 

 ¶ 10. On the night of the incident, Brown testified that he went to Griffin’s house to talk to Bracey because she kept calling him. Brown’s brother picked him up at the Dairy Barn, and they drove to Griffin’s house. His brother went inside while Bracey came outside to talk to Brown. When Brown’s brother came back outside, he and Brown attempted to leave. As they were pulling out of the driveway, Bracey called again, so they went back, and Brown went up to the house. After-wards, Brown and Bracey got in Bracey’s mother’s car and left. He denied ever throwing liquor on her.
 

 ¶ 11. After leaving Griffin’s house, Brown and Bracey drove to the motel. He checked in at the front desk and paid fourteen dollars for one hour. He denied signing a receipt at check-in or using a false name. Brown said that the only reason he was with her was for sex, and that he did not want to “be with her.” He claimed that he had no reason to hurt her. He also denied possessing a weapon, and he said that he did not plan to hurt her. After checking in, they went to the room and had unprotected sex. Brown then said that he lay in bed with his back to Bracey to wait until his time in the room expired. Brown claimed that he did not realize that Bracey had a gun until she pushed him in the back of the head, and he saw the gun. He did not think that Bra-cey was serious until she said, “if I can’t have you[,] can’t nobody have you.” After that, Brown then got on top of Bracey and made her drop the gun. According to his account, he then picked up the gun by the “part that turns,” not by the handle. However, Bracey grabbed his arm, and then Brown “snatched back from her and the gun went off.”
 

 ¶ 12. After the shooting, he said that he knew the police would take him to jail, so he ran because he wanted to see his son. He ran out of the room, and he saw Williams and told her to call an ambulance. Then he got in Bracey’s mother’s car and left. He said that he later had someone call the police so he could turn himself in for the shooting.
 

 ¶ 13. Kimberly Gilmore, who knew both Brown and Bracey, testified that Bracey had attempted to commit suicide a couple of times at least a year and a half or two before her death. According to Gilmore, Bracey had wanted to commit suicide because she was unhappy with a past boyfriend. Gilmore also testified that Bracey had a handgun, and Gilmore had seen Bra-cey with a gun on a previous occasion.
 

 ¶ 14. Brown’s brother, Robert Brown (Robert), corroborated Brown’s testimony concerning the events that led up to Brown and Bracey leaving together from Griffin’s house. Robert testified that Bra-cey had called Robert’s cell phone because she could not get in touch with Brown. Robert later picked Brown up at the Dairy Bar. Bracey called back again once Robert had picked up Brown, and the two of them went to Griffin’s house. Robert denied that they possessed any liquor at the time, and he said that Brown did not force Bra-cey to leave with him. Robert said that he and Brown had begun to leave, but they went back to the house when Bracey called again. He also testified that he had seen Bracey with a revolver a couple weeks before the incident.
 

 ¶ 15. Lastly, the defense called Brown’s mother, Sadie Willis. Bracey hád lived with her for a period of time in 2004 when Brown was in jail. Willis testified that Brown and Bracey had a turbulent relationship and that Bracey would get upset with Brown about other women. Willis said that Bracey had once attacked Brown
 
 *921
 
 and sprayed him with mace. Bracey had told her that she could not take it and that she would rather be dead than see Brown have a baby with another woman.
 

 ¶ 16. During the conference on jury instructions, the State argued that instruction D-l was an improper statement of the law and that it combined an instruction on accident and self-defense. The circuit court refused the instruction stating: “In S-3[,] I’ve given an instruction which talked about self-defense. D-l is refused.” The jury returned a verdict of guilty of murder, and the circuit court sentenced Brown to life as a habitual offender. Brown presently appeals from that conviction.
 

 DISCUSSION
 

 I. Jury Instruction on Accidental Homicide
 

 ¶ 17. In Brown’s first allegation of error, he takes issue with the circuit court’s refusal to grant defense’s proffered jury instruction D-l. He claims that he was entitled to a jury instruction that informed the jury that it must acquit him if it found that the shooting was an accident. Brown argues that his conviction requires reversal based on the court’s error in refusing to instruct the jury on the defense of accident.
 

 ¶ 18. This Court’s standard of review regarding the grant or denial of a jury instruction is as follows:
 

 Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.
 

 Chandler v. State,
 
 946 So.2d 355, 360(¶ 21) (Miss.2006) (quoting
 
 Ladnier v. State,
 
 878 So.2d 926, 931(¶ 19) (Miss.2004)). The supreme court has stated the following regarding a defendant’s right to have the jury instructed on his theory of defense:
 

 [E]very accused has a fundamental right to have her theory of the case presented to a jury, even if the evidence is minimal. We have held that “it is, of course, an absolute right of an accused to have every lawful defense he asserts, even though based upon meager evidence and highly unlikely, to be submitted as a factual issue to be determined by the jury under proper instruction of the court. This Court will never permit an accused to be denied this fundamental right.”
 

 Chinn v. State,
 
 958 So.2d 1223, 1225(¶ 13) (Miss.2007) (quoting
 
 O’Bryant v. State,
 
 530 So.2d 129, 133 (Miss.1988)).
 

 ¶ 19. The proposed jury instruction at issue, D-l, reads as follows:
 

 The court instructs the jury that if you find from the evidence, or have a reasonable doubt therefrom that Johnny Brown while in the possession of a gun, a deadly weapon, and in the heat of passion during an altercation between Viola Bracey and Johnny Brown without any design or deliberation to cause the death of Viola Bracey, fired the fatal shot accidentally and through misfortune, upon sudden and sufficient provocation, then it is your sworn duty to find Johnny Brown not guilty.
 

 The instruction included language from the statute on excusable homicide found at Mississippi Code Annotated section 97-3-17(b) (Rev.2006), which states: “The killing of any human being by the act, procurement, or omission of another shall be excusable ... (b) [w]hen committed by
 
 *922
 
 accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation....” Nevertheless, the State argued that: the instruction was not a proper statement of the law; the instruction was not supported by the evidence; and the instruction was awkwardly worded and confusing in that it was actually a combination of instructions on accident and self-defense. The circuit court concluded that it had already approved an instruction on self-defense and, therefore, denied the proposed jury instruction D-l.
 

 ¶ 20. We see no error with the circuit court’s denial of the proposed jury instruction in light of that fact that it was a confusing combination of accident and self-defense instructions.
 
 See Miller v. State,
 
 677 So.2d 726, 732 (Miss.1996) (finding no error in the circuit court’s denial of a “confusing self-defense/accident instruction”);
 
 Holmes v. State,
 
 483 So.2d 684, 686 (Miss.1986) (stating that the supreme court “has repeatedly condemned confusing and misleading instructions”). Brown did not offer a substitute jury instruction.
 

 ¶ 21. The evidence in the present case revealed that Brown brought Bracey to the motel and checked in under a false name. The wound to Bracey’s head revealed that the gun was pressed to her head when it was fired, not being snatched away as Brown claimed. There was no powder residue or blood spatter on Bra-cey’s hands, which reveals that her hands were covered and not holding the gun when it was fired. Despite Brown’s claim that the shooting was an accident, he immediately fled the scene in Bracey’s mother’s car, and he did not call the authorities or paramedics. Also, contrary to Brown’s claim that he dropped the gun on the floor, the police found no gun in the room. Accordingly, not only was the proposed accident instruction confusing, but it was not supported by the evidence presented at trial.
 

 ¶ 22. Furthermore, in light of the evidence that Brown presented concerning a struggle he had with Bracey, we find that the circuit court properly instructed the jury on self-defense. Jury instruction number eight instructed the jury that, to find Brown guilty of murder, it had to find that he killed Bracey (a) “with the deliberate design to effect” her death, or (b) “in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect” her death, and not in necessary self-defense. Taken with the instructions on manslaughter and self-defense, the jury was fully instructed on the law that was supported by the evidence. Accordingly, we find that this issue is without merit.
 

 II. Dr. Hayne’s Expert Testimony
 

 ¶ 23. Next, Brown claims that the circuit court erred in allowing Dr. Hayne to testify at trial as an expert witness. Brown’s only support for this issue is his argument that Dr. Hayne lied when questioned about his credentials as a board-certified pathologist. Brown admits that there was no objection to Hayne being allowed to testify as an expert, but Brown argues that he would have lodged an objection if Hayne had been truthful as to his credentials. Brown asks this Court to examine this issue under a plain-error analysis and to take judicial notice of a 2008 Clarion Ledger newspaper article concerning Dr. Hayne.
 

 ¶ 24. We first note that there was no objection at trial to Dr. Hayne’s qualification as an expert. At trial, defense counsel conducted voir dire of Dr. Hayne and concluded by stating that there were no objections. Accordingly, this issue was waived by Brown at trial, and it is barred from our review on appeal.
 
 McBeath v.
 
 
 *923
 

 State,
 
 739 So.2d 451, 454(¶10) (Miss.Ct.App.1999) (citing
 
 Baine v. State,
 
 604 So.2d 249, 255 (Miss.1992)). Furthermore, we can find nothing in the trial transcript to support Brown’s argument that Dr. Hayne lied about his accreditation. Dr. Hayne testified that he took two certification tests, but he walked out during one of the tests and never received a certification from that organization. He testified that he was certified by the American Board of Forensic Pathology, and he never claimed that was certified by the American Board of Pathology.
 
 [2]
 

 ¶ 25. As for the newspaper article, any facts alleged to exist by Brown “must be proved and placed before this Court by a certified record as required by law; otherwise, we cannot know of their existence.”
 
 Bean v. State,
 
 928 So.2d 979, 981(¶ 5) (Miss.Ct.App.2006) (citing
 
 Phillips v. State,
 
 421 So.2d 476, 478 (Miss.1982)). We find no support for Brown’s argument that we should take judicial notice of a newspaper article from which he has quoted in his brief.
 

 ¶ 26. Accordingly, this issue is waived, and we find no error requiring consideration under a plain-error analysis.
 

 III. Sufficiency of the Evidence
 

 ¶27. “When considering whether the evidence is sufficient to support a conviction, this Court must ask “whether the evidence shows ‘beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.’ ”
 
 Bush v. State,
 
 895 So.2d 886, 843(¶ 16) (Miss.2005) (quoting
 
 Carr v. State,
 
 208 So.2d 886, 889 (Miss.1968)). “[T]he relevant question is whether, after viewing the evidence in the- light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.”
 
 Id.
 
 (quoting
 
 Jackson v. Virginia,
 
 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).
 

 ¶ 28. Jury instruction number eight was a murder instruction, which followed the language of Mississippi Code Annotated section 97-3-19 (Rev.2006) and instructed the jury that Brown was guilty of murder if he killed Bracey:
 

 (a) with the deliberate design to effect the death of Violar Bracey or
 

 (b) ... in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of Violar Bracey, and not in necessary self-defense.
 

 Additionally, the circuit court instructed the jury on manslaughter.
 

 ¶29. The State offered evidence that Brown went to Bracey’s house, and the two of them had an altercation, at which point Brown threw liquor on her. Brown and Bracey then went, to a hotel where Brown rented a room for an hour by checking in under a false name. Brown claimed that he accidentally shot Bracey after they had sex. However, after the shooting, he left her body in the room and drove away in her mother’s car. No gun was found at the scene, and there was no evidence that anyone had been in the room other than Brown and Bracey. The State offered testimony that the gunshot wound to Bracey’s head was a contact wound that was caused by a gun being fired while in contact with her head. Furthermore, the
 
 *924
 
 State introduced letters that Brown had mailed to Bracey while he was in jail in which he had threatened to kill her.
 

 ¶30. Upon due consideration of the evidence, we find that a rational trier of fact could have found all of the essential elements of murder beyond a reasonable doubt. Therefore, we find that the evidence was sufficient to support Brown’s conviction, and we find no error with the circuit court’s denial of his motion for a directed verdict. This issue is without merit.
 

 IY. Weight of the Evidence
 

 ¶ 31. In Brown’s last allegation of error, Brown claims that his conviction is ágainst the overwhelming weight of the evidence and that the circuit court erred in denying his motion for a new trial. Appellate review of a trial court’s denial of a motion for a new trial looks to the weight of the evidence.
 
 Bush,
 
 895 So.2d at 844(¶ 18) (citing
 
 Herring v. State,
 
 691 So.2d 948, 957 (Miss.1997)). A motion for a new trial is addressed to the discretion of the trial court, and it should be granted “only, in exceptional cases in which the evidence preponderates heavily against the verdict.”
 
 Id.
 
 (quoting
 
 Amiker v. Drugs for Less, Inc.,
 
 796 So.2d 942, 947(¶ 18) (Miss.2000)). On appeal, this Court will view the evidence in the light most favorable to the verdict, and we will reverse the denial of the motion only if the verdict is “so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.”
 
 Id.
 
 (citing
 
 Herring,
 
 691 So.2d at 957).
 

 ¶ 32. After examining the evidence, we do not find that the verdict is so contrary to the overwhelming weight of the evidence so as to sanction an unconscionable injustice. Brown testified that he picked up Bracey and took her to the motel room to have sex with her. After they were finished, he claimed that Bracey pulled a gun on him, and during the ensuing struggle, the gun accidentally discharged, killing her. In support of Brown’s conviction was testimony that he and Bracey had an altercation earlier that evening, during which Brown had thrown alcohol on her. Later, Brown, using a false name, checked into a motel with Bracey. When Brown was seen leaving the motel alone, he said that he had accidentally shot his
 
 wife.
 
 Dr. Hayne testified that the wound to the head that caused Bracey’s death was a contact wound, which meant that the gun was in contact with her head when it was fired. Following the shooting, Brown left Bra-cey’s body, and he took Bracey’s mother’s car and ran. No gun was found at the motel room, and Brown was not apprehended until three days later. The State also offered into evidence letters that Brown had written to Bracey from jail, in which he threatened to kill her.
 

 ¶ 33. We find that the foregoing evidence supported Brown’s conviction for murder and that the conviction was not contrary to the overwhelming weight of the evidence. Accordingly, we find no error with the circuit court’s denial of Brown’s motion for a new trial. This issue is without merit.
 

 ¶ 34. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY OF CONVICTION OF MURDER AND SENTENCE AS A HABITUAL OFFENDER OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . Williams was also known as Tina McNair and Queen Bee.
 

 [2]
 

 . The State Medical Examiner is required to hold a certification from the American Board of Pathology. Miss.Code Ann. § 41-61-55 (Rev.2005). However, at the time of trial, Dr. Hayne was not the State Medical Examiner; therefore, section 41-61-55 did not apply to him.