# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00261-COA

**FREDERICK EDWARDS, JR. A/K/A FREDRICK D. EDWARD A/K/A FREDRICK DOUGLAS EDWARDS A/K/A FREDERICK DOUGLAS EDWARDS, JR.**                    APPELLANT

v.

**STATE OF MISSISSIPPI**                    APPELLEE

DATE OF JUDGMENT:            01/26/2021
TRIAL JUDGE:                HON. DEWEY KEY ARTHUR
COURT FROM WHICH APPEALED:  MADISON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:     OFFICE OF STATE PUBLIC DEFENDER
                            BY: JUSTIN TAYLOR COOK
ATTORNEY FOR APPELLEE:      OFFICE OF THE ATTORNEY GENERAL
                            BY: SCOTT STUART
DISTRICT ATTORNEY:          JOHN K. BRAMLETT JR.
NATURE OF THE CASE:         CRIMINAL - FELONY
DISPOSITION:                AFFIRMED - 09/27/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

## BEFORE BARNES, C.J., GREENLEE AND LAWRENCE, JJ.

## LAWRENCE, J., FOR THE COURT:

¶1.     On October 20, 2020, Frederick Edwards was convicted of second-degree murder. The Madison County Circuit Court sentenced Edwards to serve forty years in the custody of the Mississippi Department of Corrections.  After the circuit court denied Edwards's post-trial motion for judgment notwithstanding the verdict or a new trial, Edwards appealed his conviction, arguing that the trial court erred in "denying Edwards his lesser-included culpable negligence manslaughter instruction."  Upon review of the record, we affirm.

## FACTS

¶2.     On February 23, 2019, Edwards left his home at 10:00 p.m. to go to the 3 Queens poolhall (3 Queens).  When he arrived, he smoked marijuana with "some guys" outside the 3 Queens club.[1]  Later that evening, Latavia Sanders saw Edwards walking toward Johnny Forbes's home.[2]  At 11:24 p.m., Forbes called 911, asked for help, and stated Edwards had "stabbed" him.  Police arrived at Forbes's home and found a black latex glove next to Forbes's truck, which had the windows smashed out. The police found Forbes in the home still alive but covered in blood.  While at Forbes's home, the police received another 911 call about an individual lying in the parking lot at the 3 Queens club.  When the police arrived, they found Edwards lying in a grassy parking lot.  Edwards had a black latex glove on his left hand,[3] and he also was covered in blood.  After an ambulance took Edwards to a hospital, one of the officers at the parking lot noticed a trail of blood that went from where Edwards was found to Forbes's home.

¶3.     On March 2, 2019, Forbes died as a result of his stab wounds.  On August 27, 2019, Edwards was indicted for first-degree murder by a Madison County grand jury.  His trial was

---

[1] Edwards claims that after he smoked the marijuana, he blacked out because it had been laced.  Then, he was hit in the chin with bricks.  The next thing he remembers is waking up in the hospital.

[2] Sanders testified at trial that she saw Edwards knock on Forbes's door.  She also testified that she heard screaming.

[3] The State would later obtain a video from the Blue Rooster that shows a man attempting to break into a car with what appears to be a black glove on his left hand and nothing on his right hand.  This video was introduced into evidence during the State's case-in-chief.

held on October 19 and 20, 2020. The State called eight witnesses. The first witness was Dana Pickle, a 911 dispatcher for the Madison County Sheriff's Department. Pickle testified that she received a call at 11:24 p.m. on February 23, 2019 from Forbes. A recording of the call was admitted as evidence and played for the jury. During the call, Forbes states, "Freddie . . . shot, stabbed, and beat [him] the hell up."[4] Pickle testified that Forbes told her "Freddie jumped him" because Edwards was "trying to take his keys from him." Pickle testified that she dispatched law enforcement to Forbes's home. On cross-examination, Pickle agreed that it was initially hard to understand Forbes during the call "because he was speaking so fast."

¶4.     Nolan Warrington, the current Chief of Police at the Bentonia Police Department in Yazoo County, testified next. Warrington stated that on February 23, 2019, he was on duty with the Flora Police Department and responded to a call from Forbes's home on Railroad Avenue. He arrived at Forbes's home with Officer Echols. Warrington testified that the first thing he noticed when he arrived at Forbes's home was Forbes's truck, which had its windows "busted-out" and doors left open. Warrington stated that when he approached the truck, he noticed a black latex glove with blood on it lying on the ground. Warrington testified that "stuff [was] scattered all around" the truck and that "[b]lood [was] all in the truck . . . seats, dashboard, [and] steering wheel."

¶5.     Warrington stated that as he walked up the front steps of the home, he noticed "a lot of blood in the grass" and a walker "lying there by the front steps" that was also "covered in

---

[4] The State alluded in opening and closing statements that Freddie is Edwards's nickname. However, no one testified to that, including the defendant.

blood." Warrington testified that he also noticed "multiple pools of blood on the front steps leading up to the door." Warrington stated that when he opened Forbes's front door, he saw Forbes sitting in a wheelchair "frantic and traumatized." Forbes had "stab wounds through his shirt" and a "big knot on his forehead." Warrington testified that Forbes told him "a young man named Freddie asked for his truck keys. [Forbes] told Freddie no, that he needed to go on home. [Forbes] said Freddie then barged in on him, just come through the door, knocked the door in on him and he pulled a knife out of his pocket and began to stab him." Forbes also told Warrington that "the knife broke and then the young man picked up a beer bottle and hit [Forbes] in the head with it."

¶6.     Warrington testified that after an ambulance arrived to pick up Forbes, Warrington received a second call from dispatch. This call was for an individual on the "other side of Railroad Avenue along Camilla Drive." Warrington testified that he and Officer Clifton Nelson responded to the call and found Edwards lying in a grassy area near 3 Queens parking lot. Edwards was wearing a red jacket, khaki pants, a hat, and a black latex glove on his left hand. Warrington testified that the glove reminded him of the glove he saw at Forbes's home. Warrington stated that all of Edwards's clothing and the glove were "covered in blood." He also noticed a "nick" on Edwards's right arm. Warrington testified that he discovered a trail of blood that started at Forbes's home and led to where Edwards was found. Warrington testified that he saw whom he now believes to be Edwards as he was driving to Forbes's home in response to the 911 call: "As I was turning onto Railroad Avenue, I did notice a subject wearing a red jacket and khaki pants. He was walking away

4

from The Blue Rooster and towards the 3 Queens . . . ."

¶7. Warrington stated that he performed a DNA swab on Edwards. Warrington testified that among the items he took to the Scaled Laboratory were DNA swabs from Edwards, a blood sample from Railroad Avenue, "a blood sample and glove of suspect," a knife blade, a knife handle, the front passenger seat of Forbes's truck, the blood sample taken from the seat, blood samples from "several" vehicles that were in the blood trail leading to Edwards, a knife "recovered from a wheelchair at Railroad Avenue," and a brown bag that contained a silver knife.

¶8. On cross-examination, Warrington testified that neither he nor Officer Echols processed the scene at Forbes's home or obtained samples from Forbes's truck. Officer Clifton Nelson did this. When asked if he thought a "nick" bleeding seemed inconsistent with the trial of blood that led to Edwards, Warrington responded that it was not inconsistent because "[p]eople bleed different." Warrington also stated that he did not notice any injuries to Edwards's head.

¶9. The State's third witness was Latavia Sanders, who has known Edwards since elementary school. Sanders testified that she lived on the "train track behind . . . Blue Rooster restaurant." She stated that she knew Forbes because she would go to his home to help him with "stuff . . . he couldn't do . . . on his own" because he was in a wheelchair. Sanders explained that to get to Forbes's home from her home in a trailer park, "you would have to walk over the train track." Sanders testified that on the night of February 23, 2019, she was walking on that path with Jimmy Takewell, heading toward the trailer park. She

5

stated that while walking, she saw Edwards "coming over the track" at around 11:30 p.m. Sanders testified that Edwards was headed towards Forbes's home. Sanders stated that Edwards was wearing a red jacket, red hat, black gloves, and a black bag, but she did not see a weapon. Sanders testified that she heard Edwards knock on Forbes's door and heard Forbes say, "Hold on, like he's coming and stuff like that." Sanders testified that she did not see what happened, but she heard the truck alarm. Sanders stated that she was "still there when the police" arrived. Sanders testified that she had spoken to police about what she just told the jury. Sanders stated that in her initial statement to police, she told them she heard a gunshot. However, she realized it was not. When she was asked why she thought she heard a gunshot, she replied, "Because I heard screaming."

¶10. On cross-examination, Sanders testified that she and Takewell stopped momentarily on the railroad track when they saw Edwards. Sanders stated that Takewell stopped to speak to Edwards while Sanders kept walking to the trailer park. Sanders explained that she came back to the railroad tracks when she heard the "gunshots." Sanders testified that she saw Edwards knocking at Forbes's door and that she saw Edwards go inside Forbes's home. Sanders testified that this entire series of events took "about [twenty] or [thirty] minutes."

¶11. On redirect-examination, Sanders agreed that she "literally saw . . . Edwards knocking on [Forbes's] door." She testified that she left after she saw him knocking. Sanders stated that she came back because she heard the loud sounds. When she returned, she saw "all the stuff out in the yard." Sanders testified that the truck alarm was going off at this point and that she had heard screaming before the alarm.

6

¶12. Clifton Nelson, the assistant chief of police for the Flora Police Department in 2019, testified next. Nelson testified that he arrived at Forbes's home as Forbes was being loaded into the ambulance. Nelson stated that shortly after he arrived, he received a dispatch call that "a man was down at . . . 3 Queens . . . ." Nelson stated that this club was "roughly two city blocks" from Forbes's home. He and Warrington went to the location, and Echols stayed at Forbes's home. Nelson stated that when they arrived, they "located a young black male lying in the southern end of the parking lot." He testified that Edwards was "unconscious/semiconscious." He noticed that "blood had pooled on his left side," and Edwards "was wearing a red jacket, khakis, and I believe he had a black glove on his left hand." Nelson made an in-court identification of Edwards as the young man they found at 3 Queens.

¶13. Nelson testified that he processed the scene at Forbes house and the scene where they found Edwards. At Forbes's home, Nelson obtained blood samples from the "steering wheel, the console, as well as the glove box" of Forbes's truck. Nelson testified that he recovered a knife handle and blade from the master bedroom in Forbes's home. He also recovered "shards . . . of a Budweiser beer bottle" in the bedroom. Nelson testified that he recovered an additional knife from Forbes's wheelchair. Nelson testified that he took pictures of Forbes's "blood-soaked" carpet. He also photographed "near the head of the bed, apparently where the altercation mainly took place, the knife blade, [and] the shards of the Budweiser beer bottle." Nelson also processed the scene at 3 Queens where they had found Edwards. Nelson testified that he also processed three vehicles in the parking lot of 3 Queens that had

7

been "attempted to be burglarized." Nelson obtained blood samples from each vehicle.

¶14. On cross-examination, Nelson testified that he did not test any blood "that may have been . . . described as a trail" from Forbes's home to where Edwards was found because "it may have been contaminated." Nelson testified that he did consider the blood from Forbes's home to Edwards's location at 3 Queens to be a "trail." Nelson testified that he only packaged and sent the evidence to the crime lab. He did not analyze the evidence. Nelson also testified that he did not collect the glove found at Forbes's residence.

¶15. Steven Stringfellow, the owner of the Blue Rooster, was the State's next witness. During Stringfellow's testimony, the State introduced surveillance footage taken at the Blue Rooster on the night of February 23, 2019. The video was admitted and played for the jury. In the black and white video, a male can be seen wearing a glove and attempting to break into a parked car in the Blue Rooster's parking lot. Stringfellow testified that he gave the footage to police after he reviewed it. Stringfellow stated that he initially watched the video because "an employee's vehicle, that was parked there the night of, . . . had blood on the vehicle. And . . . the employee[] came to pick it up because it had broken down. And he changed his tire and he called me, and I looked over on the tape, and I said, 'That's not right.' So I called the police and they wanted me to copy the footage." Stringfellow testified that on the morning of February 24, 2019, he noticed the "handle of [the car] was torn off and there was blood . . . on the vehicle." On cross-examination, Stringfellow acknowledged that the face of the individual approaching the vehicle cannot be seen.

¶16. The State's next witness was Dr. Mark LeVaughn, the Chief Medical Examiner for

the State of Mississippi. Dr. LeVaughn had performed an autopsy on Forbes on March 6, 2019. Dr. LeVaughn testified that Forbes had eight stab wounds. Dr. LeVaughn stated that there was no evidence of a gunshot wound. Dr. LeVaughn testified that the cause of death was "multiple stab wounds," and the manner of death was homicide. Dr. LeVaughn testified that he knew Forbes had been stabbed on February 23, 2019, but died on March 2, 2019. On cross-examination, Dr. LeVaughn explained that "[t]he stab wounds initiated an event that resulted in infection of [Forbes's] blood. So bacteria is now circulating all throughout the body. The medical records show that there is penetration of the blade into the body cavities . . . . There was no actual stab injury to any of the organs. But the sealed body cavities are now contaminated, and because of that, these stab wounds. And it wasn't really the hemorrhage. [Forbes] didn't bleed to death from these wounds. He developed an infection."

¶17. The State next called George Schiro, who was the laboratory director and DNA analyst at Scaled Biological Laboratory in Brandon, Mississippi, where the State's collected evidence was sent for DNA analysis. Schiro testified that a sample taken from the center console of Forbes's truck and a sample from the passenger seat of Forbes's truck, "matched the DNA profile . . . of Edwards." Also, Schiro testified that the blood collected from 3 Queens matched Edwards's DNA profile. Further, Schiro testified that the State's two samples from the knife found in the master bedroom at Forbes's home had a "mixed DNA profile consisting of at least two individuals, most likely one major DNA contributor and one minor DNA contributor." Schiro stated that Forbes's DNA matched the major contributor.

9

Schiro also testified that "Edwards was excluded as a minor contributor." Finally, Schiro stated that two swabs of bloodstains from the glove collected at 3 Queens matched Edwards's DNA profile. The State rested after presenting the evidence of DNA testing.

¶18. The Defense called one witness, Edwards. He stated that on February 23, 2019, he was at his house. Edwards testified he left his home at 10:00 p.m. and walked to a poolhall. He stated that once he got to the poolhall, "some guys" standing outside offered him a joint, and he "hit the joint" and "blacked out." Edwards testified that he believed the marijuana had been laced since he blacked out. Edwards testified he remembered that someone cut him on his arm. He also remembered saying, "All these cars are mine." Edwards testified that the last thing he remembered was being "knocked out." Edwards stated, "Somebody had hit me with a brick and . . . another person had hit me with a brick and it knocked me out . . . . I was cold." Edwards explained that "the last car that I walked up on, I kept trying to open up . . . the handle, and that's when somebody came and hit me with a brick right here in my chin. I've still got the mark right here . . . . It knocked me out cold." Edwards stated the next thing he remembered was waking up in the hospital the next morning. Edwards testified that he did not remember seeing Forbes on February 23, 2019, nor did he remember "going into" Forbes's vehicle.

¶19. On cross-examination, Edwards testified that he did not provide any of the allegedly laced marijuana to the crime lab for testing. Edwards stated that he did not personally know Forbes, but he had gone to Forbes's home to "help him because he's in a wheelchair and can't really do much." Edwards testified that he cannot remember what happened when he

talked to Sanders on February 23, 2019: "Well, if you asked me did I speak to her, I did speak to her, but I never went to—I never went to [Forbes's] house." Edwards stated that he "could have sworn" the conversation occurred at 10:00 p.m.[5] Edwards disagreed that Sanders heard him knock on Forbes's door because he cannot remember doing it. Edwards stated that Sanders was lying about seeing him go to Forbes's home that night.

¶20. Edwards also explained how he got the cut on his arm, stating, "I think when I was knocked out by the brick my body slid across the ground, and I think that's what slashed my arm, because I was knocked out pretty hard . . . ." Edwards also testified that he was trying to get into cars "after [he] hit the laced joint." He explained that while he was trying to "open the handle on the passenger side, . . . somebody tapped [him] on [his] shoulder, and bam." Edwards testified that he did not try to break into any vehicles at the Blue Rooster. When asked if he was wearing a red jacket that night, Edwards responded, "I was wearing a red—I can't remember what I was wearing that night, but if everybody said I was wearing a red jacket, that's what I was wearing." Edwards also agreed that "as far as [he] [knew]," he did not go anywhere other than the grassy area where he was found after he was hit.

¶21. At the end of the defense's case-in-chief, Edwards requested a culpable negligence manslaughter jury instruction. The State objected to this jury instruction, arguing that Edwards had no evidentiary basis to support the instruction. The trial court ultimately refused the jury instruction request. In its reasoning, the court stated, "This is where the court is having a problem with culpable negligence manslaughter. It was not the smoking

---

[5] On redirect, Edwards stated that he talked to Sanders when he left his house at 10:00 p.m.

11

of a joint that caused the death of Mr. Forbes. Do you understand that, where I am coming from on that . . . ? Culpable negligence manslaughter is usually something to the effect of this person did something that was negligent that caused the death. There's no connection between . . . smoking . . . marijuana and the death of . . . Forbes." On October 22, 2020, the jury convicted Edwards of second-degree murder. Edwards appealed, arguing that the trial court erred in refusing his culpable negligence manslaughter jury instruction. Upon review of the record, we find that the trial court judge did not err.

## ANALYSIS

**The trial court did not err in refusing Edwards's request for a culpable negligence manslaughter jury instruction.**

¶22. "Questions of whether a defendant is entitled to a lesser-included offense instruction are questions of law that this Court reviews de novo." *Downs v. State*, 962 So. 2d 1255, 1258 (¶10) (Miss. 2007); *see also Johnsey v. State*, 296 So. 3d 93, 95 (¶8) (Miss. Ct. App. 2019). Mississippi Code Annotated section 97-3-47 (Rev. 2014) defines manslaughter as the "killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law, not provided for in this title . . . ." "The statutory elements of culpable-negligence manslaughter are 'an unlawful killing by the culpable negligence of another.'" *Wise v. State*, 263 So, 3d 668, 675 (¶30) (Miss. Ct. App. 2018). The Mississippi Supreme Court has explained that culpable negligence manslaughter requires "such gross negligence . . . as to evince a wanton or reckless disregard for the safety of human life, or such an indifference to the consequences of an act under the surrounding circumstances as to render such conduct tantamount to willfulness." *Chandler v. State*, 946 So. 2d 355, 361

12

(¶22) (Miss. 2006) (quoting *Shumpert v. State*, 935 So. 2d 962, 967 (¶14) (Miss. 2006)).

¶23.    A defendant charged with murder is not automatically entitled to a manslaughter jury instruction without an evidentiary basis. *See Hurns v. State*, 616 So. 2d 313, 320 (Miss. 1993); *Goff v. State*, 778 So. 2d 779, 782 (¶¶7-8) (Miss. Ct. App. 2000); *Sanders v. State*, 781 So. 2d 114, 119-20 (¶¶14-17) (Miss. 2001). While a criminal defendant "is entitled to jury instructions that present his theory of the case even if the supporting evidence 'is weak, inconsistent, or of doubtful credibility,'" a defendant does not have an absolute right to a jury instruction that presents his theory of the case. *Gebben v. State*, 108 So. 3d 956, 966 (¶31) (Miss. Ct. App. 2012) (quoting *Banyard v. State*, 47 So. 3d 676, 682 (¶17) (Miss. 2010)). "The court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or **is without foundation in the evidence.**" *Id.* (emphasis added) (quoting *Harris v. State*, 861 So. 2d 1003, 1012-13 (¶18) (Miss. 2003)). Here, Edwards provided no evidence to support a culpable negligence manslaughter jury instruction.

¶24.    This case is similar to *Fairley v. State*, 871 So. 2d 1282 (Miss. 2003). Fairley and his girlfriend were driving to Vicksburg when an argument ensued. *Id.* at 1283 (¶2). During the argument, Fairley pulled out his gun and pointed it at his girlfriend's head. *Id.* "According to Fairley, the gun accidentally discharged and struck [his girlfriend] in the head," killing her. *Id.* After shooting his girlfriend, he stopped his car, shoved her body into the road, and drove away. *Id.* at (¶3). Fairley confessed to the killing and was convicted for the murder of his girlfriend. *Id.* Fairley appealed the conviction and argued that the trial court erred in

refusing his proposed jury instruction for culpable negligence manslaughter. *Id.* at 1284 (¶9). The Supreme Court of Mississippi had to determine whether the trial court properly denied the culpable negligence manslaughter jury-instruction request. *Id.* at 1287 (¶11). The supreme court stated, "Fairley's ruthless actions occasioned the victim's demise." The court held that the facts of this case warranted a heat of passion jury instruction, not a culpable negligence manslaughter jury instruction. *Id.*

¶25. Like *Fairley*, Edwards requested a culpable negligence manslaughter jury instruction and the trial court denied it, finding that the only evidence Edwards presented was that he smoked potentially laced marijuana. No evidence indicated that Edwards was negligent for stabbing Forbes eight times and hitting him on the head with a beer bottle. Edwards maintained that he could not remember the incident at all. He also maintained that Sanders, who placed him on Forbes's front porch, lied about seeing him that night. There is a complete lack of any evidentiary basis to support Forbes's death was negligently caused. Eight stab wounds and smashing a beer bottle across Forbes's head vitiates any evidentiary justification that Edwards acted in a culpable negligent manner.

¶26. It is somewhat unclear on appeal if Edwards is claiming that his culpable negligent "act" was the ingestion of marijuana, which he claimed was laced and "knocked him out." At trial, it appears that is what Edwards attempted to argue. However, this argument lacks merit not only from an evidentiary basis but also from a review of relevant legal authority. There simply is no evidence in the record that the marijuana caused him to stab a man eight times. Edwards does not state that. He stated that he smoked marijuana; it "knocked [him]

14

out"; and he did not remember anything about the murder. Just as important, the law in this State is clear on this point. An individual cannot avoid criminal liability for criminal actions committed after voluntarily ingesting alcohol or an illegal narcotic.[6] *See Abeyta v. State*, 137 So. 3d 305, 312 (¶17) (Miss. 2014); *Moore v. State*, 859 So. 2d 379, 386 (¶23) (Miss. 2003); *Davis v. State*, 684 So. 2d 643, 652-53 (Miss. 1996).[7]

¶27.    In contrast to the defense's request for a culpable negligence jury instruction, the State provided ample evidence to support a first- and second-degree murder jury instruction. Specifically, the State showed: Edwards walked to Forbes's house, knocked on the door, and asked Forbes for his truck keys. When Forbes refused, Edwards came into Forbes's home and stabbed Forbes eight times. When Edwards's knife broke, he picked up a beer bottle and smashed it over Forbes's head. When Edwards left Forbes's home, Forbes called 911 and identified Edwards as his attacker. A witness saw Edwards knock on Forbes's front door. She did not see what happened, but a short time later, she heard Forbes's truck alarm sounding and someone screaming. When officers arrived at Forbes's home, Forbes identified Edwards as his attacker. Later that same night, after the stabbing, Edwards was found

---

[6] "If a defendant, when sober, is capable of distinguishing between right and wrong, and . . . voluntarily deprives himself of the ability to distinguish between right and wrong by reason of becoming intoxicated and commits an offense while in that condition, he is criminally responsible for such acts." *Davis*, 684 So. 2d at 652-53 (citing *McDaniel v. State*, 356 So. 2d 1151, 1161 (Miss. 1978)). Edwards testified that he smoked marijuana. The manner by which an individual becomes intoxicated does not negate the rule pronounced in *McDaniel* or the Model Jury Instruction. *See McDaniel*, 356 So. 2d at 116; Mississippi Model Jury Instructions (Criminal) § 2:8 (Miss. Judicial Coll. 2021-2022 ed.).

[7] During the charge conference at trial, Edwards's attorney argued that the culpable negligence manslaughter statute was a "catchall" for manslaughter, which authorized a culpable negligence manslaughter instruction when a defendant is indicted for murder.

15

unconscious in a grassy parking lot a few blocks away with a trail of blood leading from Forbes's home to Edwards's location. Edwards had a black latex glove on his left hand when he was found, which was similar to the black latex glove found at Forbes's home. Edwards's DNA profile matched samples obtained from Forbes's truck, which was at Forbes's home.

## CONCLUSION

¶28. Because Edwards failed to provide or point out to the trial court any evidence to support a jury instruction for culpable negligence manslaughter, we affirm the trial court's refusal of Edwards's jury instruction, and we affirm the circuit court's judgment of conviction and sentence.

¶29. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**